# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JEROLD WASHINGTON, | : | Civil Action No. 02-4451 |
|  | : |  |
| Plaintiff, | : | The Honorable Clifford Scott Green |
|  | : |  |
| v. | : |  |
|  | : |  |
| NATIONAL RAILROAD PASSENGER | : |  |
| CORPORATION D/B/A AMTRAK, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Judith E. Harris, Esquire ( I.D. #02358)
William J. Delany (I.D. #74864)
Paul C. Evans (I.D. #84535)
1701 Market Street
Morgan, Lewis & Bockius LLP
Philadelphia, Pennsylvania 19103
(215) 963-5000

Attorneys for Defendant
National Railroad Passenger Corporation

Dated:  October 30, 2003

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF UNDISPUTED FACTS ........................................... 3

    A.    Amtrak Maintains and Enforces A Strong And Effective Policy Prohibiting Sexual Harassment And Discrimination. ............................ 3

    B.    Structure of Placements Within BMWE Jobs. ................................... 6

    C.    Plaintiff's Employment With Amtrak. ............................................. 6

    D.    Plaintiff's Complaint Against Mr. Hogan. ........................................ 8

    E.    Plaintiff's Applications For Assistant Engineer Positions. .................. 11

    F.    Plaintiff's Additional Race And National Origin Discrimination Claim. ............ 12

III.  ARGUMENT ..................................................................................... 12

    A.    Plaintiff Cannot Avoid Summary Judgment With Conclusory Allegations And Mere Speculation. ............................................... 12

    B.    Plaintiff's Racial Harassment Claims Must Fail Because Plaintiff Cannot Establish The Existence Of Respondeat Superior. ......................... 13

    C.    The Court Should Grant Summary Judgment On The Disparate Impact Claim In Count IV Of Plaintiff's Complaint. ................................. 17

    D.    The Court Should Dismiss Plaintiff's Discrimination Claims In Connection With The Boom Truck Operator And Assistant Engineer Positions. ...................................................................... 20

        1.    Plaintiff Cannot Prove A Prima Facie Case To Support His Race Discrimination Claims. .................................................... 21

            a)    The Boom Truck Position. ....................................... 22

                (1)    Plaintiff Did Not Apply For The Boom Truck Driver Position And, Therefore, He Was Not Qualified For The Same. ................................. 22

                (2)    Even If Plaintiff Had Been Improperly Denied The Boom Truck Job – Which He Was Not – His Failure To Get That Position Was Without Consequence. .......................................... 22

            b)    The Assistant Engineer Positions. ............................. 23

        2.    Amtrak Has Articulated Legitimate Nondiscriminatory Reasons For Not Promoting Plaintiff To The Challenged Positions. ............ 24

            a)    The Boom Truck Position. ....................................... 24

            b)    The Assistant Engineer Positions. ............................. 24

3.    Plaintiffs Have Adduced No Evidence That Amtrak's Legitimate
Nondiscriminatory Reasons For Its Decisions Were Pretextual............. 25

a)    The Boom Tuck Position. ........................................................... 25

b)    The Assistant Engineer Positions................................................ 26

IV.    CONCLUSION................................................................................................ 27

## TABLE OF AUTHORITIES

### CASES

Abramson v. William Paterson Coll. of N.J.,
260 F.3d 265 (3rd Cir. 2001) ......................................................................21, 25

Adefumi v. City of Philadelphia, Free Library,
No. Civ. A. 01-5565, 2003 WL 21956417 (E.D. Pa. July 17, 2003)............17

Allen v. National R.R. Passenger Corp.,
90 F.Supp.2d 603 (E.D.Pa. 2000), aff'd, 254 F.3d 1077 (3d Cir. 2001) ......14

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)......................................................................................12

Barbosa v. Tribune Co.,
Civ. A. No. 01-1262, 2003 WL 22238984 (E.D. Pa. Sept. 23, 2005) ...........16

Bullock v. Childrens Hosp. of Philadelphia,
71 F.Supp.2d 482 (E.D. Pa. 1999) ...............................................................24

Cardenas v. Massey,
269 F.3d 251 (3d Cir. 2001)..........................................................................13

Celotex Corp. v. Catrett,
477 U.S. 317 (1986).......................................................................................12

Cohen v. Pitcairn Trust Co.,
No. Civ. A. 99-5441, 2001 WL 873050 (E.D. Pa. June 20, 2001) ...............25

General Building Contractors Ass'n, Inc., v. Pennsylvania,
458 U.S. 375 (1982).......................................................................................17

Goosby v. Johnson & Johnson Med. Inc.,
228 F.3d 313 (3d Cir. 2000)...........................................................................14

Gourley v. Home Depot,
No. CIV. A. 99-5728, 2001 WL 755102 (E.D. Pa. June 29, 2001) ...............25

Jones v. Sch. District of Philadelphia,
198 F.3d 403 (3rd Cir. 1999) .........................................................................20

Josey v. John R. Hollingsworth Corp.,
996 F.2d 632 (3rd Cir. 1993) .........................................................................19

King v. Sch. District of Philadelphia,
No. 00-CV-2503, 2001 WL 856948 (E.D. Pa. July 26, 2001).....................................21

Koschoff v. Henderson,
109 F.Supp.2d 332, 348 (E.D. Pa. 2000) ................................................................16

Kunin v. Sears, Roebuck & Co.,
175 F.3d 289 (3d Cir. 1999) ...........................................................................13, 14

Martin v. Healthcare Bus. Res.,
No. 00-3244, 2002 WL 467749 (E.D. Pa. March 26, 2002).................................21, 25

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973).......................................................................................21

Newark Branch, N.A.A.C.P. v. City of Bayonne,
134 F.3d 113 (3rd Cir. 1998) .......................................................................18, 19

Newark Branch, NAACP v. Town of Harrison,
940 F.2d 792 (3d Cir. 1991)................................................................................19

Osuala v. Cmty. Coll. of Philadelphia,
No. Civ. A. 00-98, 2000 WL 1146623 (E.D. Pa. Aug. 15, 2000)..................................26

Robertson v. Allied Signal, Inc.,
914 F.2d 360 (3d Cir. 1990)................................................................................13

Schoch v. First Fidelity Bancorporation,
912 F.2d 654 (3d Cir. 1990)................................................................................13

Sherrod v. Philadelphia Gas Works,
No. 02-2153, 2003 WL 230709 (3rd Cir. Jan 14, 2003)................................................13

St. Marys Honor Ctr. v. Hicks,
509 U.S. 502 (1993)...........................................................................................21

Texas Dep't of Cmty. Affairs v. Burdine,
450 U.S. 248 (1981)...........................................................................................21

Verney v. Dodaro,
872 F. Supp. 188 (M.D. Pa. 1995), aff'd, 79 F.3d 1140 (3d Cir. 1996) ...................18, 20

Wards Cove Packing Co., Inc. v. Atonio,
490 U.S. 642, 657 (1989).................................................................................18, 19

Page

West v. Philadelphia Electric Co.,
45 F.3d 744 (3d Cir. 1995)................................................................................13

Weston v. Pennsylvania,
251 F.3d 420 (3d Cir. 2001) ...........................................................13, 14, 16, 17

## RULES

Fed. R. Civ. P. 56 ...........................................................................................12

## STATUTES

42 U.S.C. § 1981 ............................................................................... *passim*

42 U.S.C. § 1983.................................................................................................1

42 U.S.C. § 2000e et seq....................................................................................1

43 P.S. § 951 et seq. ..........................................................................................1

## I.    **INTRODUCTION**

Plaintiff Jerold Washington ("Plaintiff" or "Washington") worked for Defendant National Passenger Railroad Corporation ("Amtrak") until his May 2003 resignation. In December 2000, Plaintiff filed an internal complaint of racial harassment against a co-worker, James Hogan. Pursuant to the Amtrak's policy against racial harassment, Amtrak immediately undertook an investigation into Plaintiff's allegations. After the investigation, Amtrak credited Plaintiff's allegations and determined that Mr. Hogan was in violation of Amtrak's policies regarding (1) discrimination and harassment, (2) attending to duties, and (3) professional and personal conduct. Accordingly, as required by Amtrak's contract with Mr. Hogan's (and Plaintiff's) union the Brotherhood of Maintenance and Way ("BMWE"), Amtrak proceeded with charges against Mr. Hogan, seeking Mr. Hogan's termination. Mr. Hogan resigned his employment rather than contest Amtrak's charges. Significantly, Plaintiff never worked with Mr. Hogan after he levied his complaint. Even more significantly, Plaintiff never complained again about any other harassment at Amtrak.

On July 5, 2002, Plaintiff brought this action, alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA") and 42 U.S.C. § 1981.[1] Plaintiff asserts three separate causes of action under these statutes. First, notwithstanding Amtrak's prompt investigation into Plaintiff's complaint, and its effective, corrective response

---

[1]   Plaintiff's initial Complaint included allegations that Amtrak violated (1) the Fifth Amendment, (2) 42 U.S.C. § 1983, and (3) the terms of its contract with the BMWE. Pursuant to Amtrak's Motion for Partial Dismissal of Plaintiff's Complaint, the Court dismissed these claims on December 18, 2002. (See Memorandum and Order, dated December 18, 2002). Subsequent to that Order, Plaintiff filed an Amended Complaint, wherein he asserted the § 1981 claims addressed in this Memorandum.

thereto, Plaintiff now contends that Amtrak is liable for Mr. Hogan's alleged racial harassment of Plaintiff.  Second, Plaintiff claims that, because of his race and national origin, he was denied a Boom Truck Driver position in Amtrak's Lancaster Division and Assistant Engineer positions in Amtrak's New York, Delaware, Washington, D.C. and Philadelphia Divisions.  Finally, Plaintiff claims that Amtrak's New York Division has a policy requiring applicants for its Assistant Engineer positions to live within 60 miles of Pennsylvania Station in New York City, which Plaintiff alleges has a disparate impact on African American applicants for those positions.

Amtrak hereby moves for summary judgment of each of Plaintiff's remaining claims.  The grounds for this Motion are as follows:

- Plaintiff's harassment claim must fail because Plaintiff has adduced no evidence from which a reasonable trier of fact could impute Mr. Hogan's alleged conduct to Amtrak.  Indeed, Amtrak responded immediately to Plaintiff's only complaint of harassment and promptly stopped all alleged harassment.

- Plaintiff cannot sustain his failure to promote claims because (1) he has adduced no evidence creating even an inference of discrimination with respect to his failure to receive the challenged positions; (2) he never bid for the Boom Truck Driver position as required by both the contract between his union, BMWE, and Amtrak; and (3) Plaintiff has not adduced any evidence that Amtrak's legitimate nondiscriminatory reasons for selecting other applicants for the positions he sought were pretexts for racial discrimination.

- Plaintiff has failed to establish even a prima facie case of disparate impact discrimination because he has adduced absolutely no evidence of the impact of Amtrak's New York Division's alleged policy on African American and Caucasian applicants.

2

For these reasons, and the reasons set forth below, Amtrak respectfully requests that this Court grant summary judgment on all of Plaintiff's claims and dismiss Plaintiff's Complaint and Amended Complaint with prejudice.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Amtrak Maintains and Enforces A Strong And Effective Policy Prohibiting Sexual Harassment And Discrimination.

Amtrak does not tolerate discrimination or harassment. Accordingly, Amtrak maintains a strict policy against racial harassment and discrimination. (McCallum Decl., attached hereto as Exhibit A, ¶¶ 1-2, (Ex. 1)). On December 28, 1999, Amtrak mailed a copy of this policy to every employee.[2] Id.. The policy provides that:

> Amtrak strictly prohibits harassment or other forms of discrimination based upon an individual's gender, race, color, religion, national origin, age, disability, veteran's status, sexual orientation or other characteristics protected by law. Also, Amtrak strictly prohibits retaliation against an individual who has complained of or participated in the investigation of a discrimination or harassment complaint. Violation of this policy constitutes an act of serious misconduct that can result in disciplinary action up to and including termination.

Id.

Amtrak requires its employees to report disrespectful, offensive or harassing conduct so that it can take the necessary steps to remedy the specific situation and rid its workplace of such behavior. (See id. ("Amtrak takes every complaint of discrimination and harassment seriously, and encourages every employee to report any violation of this Harassment policy promptly . . .")). In order to further encourage prompt reporting of any and all behavior prohibited by the Harassment Policy, Amtrak provides for an effective complaint mechanism, which assures that its employees are comfortable reporting any allegations of racial harassment.

---

[2]    As set forth below, Plaintiff began working for Amtrak on May 10, 1999 and was employed on December 28, 1999. (Washington Dep., Ex. B, p. 14).

(Id.). That mechanism permits employees to report any and all concerns to their immediate

supervisor, the supervisor/manager of their immediate supervisor, Amtrak's Dispute Resolution

Office, in person or over the telephone, or an Amtrak Human Resources Office. (Id.). By

providing these multiple avenues for employee complaints, Amtrak assures that its employees

are not required to report harassment to the alleged harasser, or to anyone with whom they do not

– for any reason – feel comfortable complaining. (Id.). To further encourage reporting, Amtrak

specifically advises its employees that ". . . no retaliation of any kind will be taken as a result of

filing a complaint." (Id.).

Amtrak reaffirms its commitment to providing a work environment free of

discrimination and harassment in an annual letter from its President and Chief Executive Officer

to its employees. (Id. at ¶¶ 2, 4, Ex. 2). This letter states: "Amtrak will not tolerate

discrimination or harassment based on an individual's race, color, religion, sex, national origin,

age, disability, sexual orientation. or veteran's status. . . . Appropriate discipline – including

termination when warranted – will be used to address any violations of this policy." (Id.).

Further evidencing Amtrak's commitment to providing a workplace free of racial

harassment and discrimination, in February 2000, Amtrak implemented a state-of-the-art internal

process for handling claims of discrimination and harassment. Specifically, Amtrak created an

internal department, the Dispute Resolution Office (the "DRO"), to serve as a neutral evaluator

of employee complaints and disputes. (Id. at ¶¶ 2, 5, Ex. 3). In the letter announcing the DRO to

Amtrak employees, Amtrak reiterated its commitment "to providing a workplace free from

discrimination, harassment or retaliation based upon a person's race, color, sex, age, national

origin, religion, disability, veteran status, sexual orientation or any other legally protected

characteristic." (Id.).

4

Amtrak also provides all new employees with a Standards of Excellence booklet. (Id. at ¶¶ 2, 6, Ex. 4, p. 6). That booklet summarizes Amtrak's policy against harassment and discrimination as follows:

> Amtrak will continue to be a leader in providing equal opportunity for employees in a work environment free of discrimination and harassment. As a matter of policy, we manage this company and administer our programs without regard to race, color, religion, sex, national origin, age, disability, sexual orientation or veteran's status and in conformance with all applicable federal, state and local laws.

> Therefore, we will not tolerate discrimination or harassment *of any kind* by our employees toward our customers or coworkers, including but not limited to ethnic, religious or sexual slurs, whether written or spoken.

(Id.) (emphasis in original).

Plaintiff acknowledged that he was aware of Amtrak's policy prohibiting racial harassment. (Washington Dep., relevant portions of which are attached hereto as Ex. B, pp. 162-169). Although Plaintiff was unable to affirmatively state that he had seen the specific Harassment policy sent in December 1999, he acknowledged that he had been provided with a policy like this one during an Amtrak training course. (Id. at 169). Moreover, Plaintiff acknowledged that he signed a form indicating that he had read the Amtrak Standards of Excellence Booklet, although he did not recall reading it at the time of his deposition. (Washington Dep., Ex. B, pp. 162-63; Washington Dep. Exhibit 5).

Amtrak also trains all employees on it strict policy against harassment and discrimination. (McCallum Decl., Ex. A, ¶ 8). In fact, Amtrak supervisors were required to attend a multi-day training course regarding Amtrak's diversity policies, including its policy against racial harassment and discrimination. (Reading Dep., attached hereto as Ex. C, pp. 23-24). Non-supervisory employees were required to attend a one-day training course on the same issues. (Id. at 25). Although he attempted to downplay it, Plaintiff acknowledged that he

received diversity training, which included references to Amtrak's policy against racial harassment and discrimination. (Washington Dep., Ex. B, pp. 167-68).

**B.      Structure of Placements Within BMWE Jobs.**

While employed at Amtrak, Plaintiff was in the BMWE. (Id. at pp. 204-05). Pursuant to Amtrak's contract with BMWE, all BMWE positions are subject to a bid process and positions are awarded to the senior qualified employee to bid for the position. (BMWE Contract, relevant portions of which are attached hereto as Ex. D, Rule 1, p. 25). Moreover, any employee displaced from his or her position may bid on any position held by an employee with lower seniority and, thereby, "bump" the employee with lower seniority out of his or her position. (Id. at Rule 11, p. 29). All bids must be prepared on a Bid Form and submitted to "the official whose name appears on the advertisement, who will detach receipt, sign, and return same to the applicant." (Id. at Rule 3(c), p. 27).

With respect to BMWE positions advertised in the Lancaster Division, all bids are made to and processed by an assignment office in Philadelphia. (Reading Dep., Ex. C, p. 19). Although he is the Lancaster Supervisor, Mr. Reading does not know when someone bids for a job in the Lancaster Division and does not determine who is the senior qualified bidder entitled to the job under the BMWE contract. (Id.).

**C.      Plaintiff's Employment With Amtrak.**

Plaintiff began working as a Trackman for Amtrak on May 10, 1999. (Washington Dep., Ex. B, p. 14.) Between May 1999 and December 1999, Plaintiff worked primarily on what are known as traveling gangs. (Id. at pp. 15-16.) Prior to December 1999, Plaintiff had not worked at the Lancaster Track. (Id. at p. 17). In or about December 1999,

Plaintiff bid for and received a position as a Bus Driver in Amtrak's Lancaster Division.[3]  (Id.). He held that position until approximately April 2000.  (Id. at p. 22).

In April 2000, Plaintiff sought and received an open position in Amtrak's Perryville, Maryland Division as a Bus Driver.  (Id.).  He subsequently bid for and received an open position on a traveling gang that worked repairing the railroad tracks along Amtrak's Northeast Corridor.  (Id. at p. 23).  Plaintiff preferred working in the traveling gangs, and earned more compensation when he did so.  (Id. at pp. 23-25).  In the summer of 2000, Plaintiff returned to the Perryville, Maryland Division before returning to the Lancaster Division as a Bus Driver in August 2000. (Id. at pp. 25-26).   He was in Lancaster for approximately one month between August and September 2000.  (Id. at pp. 25-26).

In September 2000, Plaintiff bid out of Lancaster and back onto a traveling gang. (Id. at pp. 50-51).  He returned to Lancaster for the last time on November 22, 2000.  (Id.). On December 4, 2000, Plaintiff was bumped out of the Lancaster Division by a more senior co-worker.[4]  As a result, Plaintiff never worked in Lancaster again.  (Id. at  p. 185). It was during this final, short stint in Lancaster that Plaintiff levied his only complaint of harassment with Amtrak.  (Id. at pp. 114-17).

---

[3]  Plaintiff claims that he was bumped from this position by a senior Amtrak employee on the day he first arrived at Lancaster to work as a bus driver.  (Washington Dep., Ex. B, pp. 18-19).  After two weeks, however, Plaintiff claims that the individual who bumped him was found not to be qualified as a Bus Driver and Plaintiff was contacted and took the Bus Driver position.  (Id. at pp. 19-20).  Plaintiff admits that Amtrak retroactively provided him with compensation as a Bus Driver for the two weeks during which he claims the other, more senior, individual was in the Bus Driver position without the proper qualifications.  (Id. at pp. 20-22).

[4]  Plaintiff acknowledged that it is common during the winter months for senior Amtrak employees working on the more well-paying traveling gangs to become displaced and bump into Lancaster and other locations.  (Id. at p. 186).  He also admitted that it was

After he was bumped out of the Lancaster Division, Plaintiff voluntarily elected to be furloughed. (Id. at pp. 54-57). He did so because there were no positions close to his home into which he was senior enough to bump. (Id.). Plaintiff's furlough lasted until March 2001, when he bid on and received a position in a traveling gang. (Id. at pp. 58-60). He stayed in the traveling gang until he bid on and received a position in the New York Division in June 2001. (Id.). In July 2001, Plaintiff went out on a medical leave of absence, which he claims was necessitated by job stress and the work atmosphere. (Id. at pp. 60-61).

Plaintiff stayed on his leave of absence until January 2002. Upon his return, he worked in Amtrak's New York and Morrisville Divisions until taking a second medical leave of absence in or around June 2002. (Id. at pp. 62-63). Plaintiff never worked for Amtrak after taking his second medical leave of absence. He tendered his resignation in May 2003. (Id. at pp. 67-70).

**D.**    **Plaintiff's Complaint Against Mr. Hogan.**

Plaintiff's only complaint to Amtrak management about racial harassment occurred on December 1, 2000. He first made his complaint to Bernie Reading, Lancaster Track Supervisor, and Donnie Leaman, Mr. Reading's assistant. (Id. at pp. 157-62, 171). His complaint at that time concerned two incidents that he alleges occurred the day before, on November 30, 2003. Specifically, Plaintiff alleged that a co-worker – whom he was unwilling to name at that time – pointed to an exterminating truck with a confederate flag sticker that was in Amtrak's parking lot and said that the sticker meant "that they're here to exterminate the pests . . . meaning black people." (Id. at p. 130). He also alleged that later on November 30, 2003,

_____

proper for a person more senior than him to bump into the Lancaster division at that time. (Id. at p. 187).

while he and Mr. Hogan were alone on the bus, Mr. Hogan taped him to the driver's seat where he was sitting. (Id. at pp. 144-46). After a co-worker helped him remove the tape, Plaintiff alleged that Mr. Hogan walked up to him with a noose in his hand and said "do you know what this is for? To hang [your] black ass with." (Id.).

When Plaintiff first made his complaint, he stated that he did not trust Mr. Reading to handle the matter. (Id.) As a result, Mr. Reading also had Plaintiff talk with Mr. Leaman about the complaint. (Id.) Mr. Reading then approached Plaintiff before he left work for the day. Plaintiff testified that as follows:

> A:    . . . So, [Mr. Reading] came up and was telling me about [the DRO]. And he says he's not sure of it. He knows little or nothing about it. He said, there's a number that he can call to report it. He apologized. He say he'll handle it the best he can. And he wanted to talk with other co-workers, meaning Jim Hogan.

(Id. at pp. 161-62).

Following this conversation, Mr. Reading began an investigation into Plaintiff's allegations of harassment. (Reading Dep., Ex. C, pp. 31-36). He immediately advised his supervisor of Plaintiff's complaint. (Id.). Pursuant to his supervisor's direction, Mr. Reading then collected written statements from the individuals on the gang working with Plaintiff. (Id.). The next business day, Monday, December 4, 2000, Plaintiff submitted a written complaint addressed to both Mr. Reading and the DRO. (Washington Dep., Ex. B, p. 171, Exhibit 9). In this written complaint, Plaintiff for the first time asserted that Mr. Hogan was the individual whom he was claiming had harassed him. In this written complaint, Plaintiff reiterated his complaints about Mr. Hogan's November 30, 2000 conduct. He also alleged that sometime earlier Mr. Hogan wrote on his work boots and refused to apologize. (Id. at Ex. 9).

Plaintiff admits that this was his only complaint about discrimination or harassment to anyone in Amtrak management. (Id. at pp. 174-76, 220-222). He also admits that

the only allegations that he made in connection harassment complaints concerned Mr. Hogan and he never complained to anyone at Amtrak about any harassment other than the harassment described in his written complaint.  (Id.).

Immediately upon receipt of Plaintiff's written complaint, Mr. Reading forwarded a copy to his supervisor, who forwarded the complaint to the Dispute Resolution Office. (Reading Dep., Ex. C, pp. 42-43).  At that point, the DRO took over the investigation of Plaintiff's complaint. (McCallum Decl., Ex. A, ¶¶ 9-11, Ex. 5).  As a result of being bumped by a senior member of his union on December 4, 2003, Plaintiff never worked in Lancaster again. (Washington Dep., Ex. B, p. 185).  He also never again worked with Mr. Hogan, who took a leave of absence related to stress he claimed was caused by what he alleged were false allegations of racism by Plaintiff.  (Id.).

Shortly after Plaintiff submitted his written complaint, a DRO representative interviewed Plaintiff.  At that time Plaintiff reiterated his written allegations against Mr. Hogan; he did not make any additional complaints or complain about anyone other than Mr. Hogan. (McCallum Decl., Ex. A, ¶¶ 9-11, Ex. 5; Washington Dep, Ex. B, pp. 174-176).  DRO also interviewed Mr. Hogan, who denied making any racially derogatory statements or harassing Plaintiff because of his race.  (McCallum Decl., Ex. A, ¶¶ 9-11, Ex. 5).  DRO also interviewed Plaintiff's other co-workers.  While one of these individuals saw Mr. Hogan tape Plaintiff to the bus driver's seat, none of them heard any racially derogatory remarks.  (Id.).

At the conclusion of its investigation, the DRO determined that Plaintiff's allegations regarding Hogan's conduct on November 30, 2000 were valid.  (Id.).  It believed that Plaintiff's version of the events was more credible than Mr. Hogan's.  (Id.).  DRO determined

that Mr. Hogan should be charged with violating Amtrak's Corporate Harassment Policy and that the disciplinary process should be initiated immediately. (Id.).

As a result of the DRO's findings, Mr. Hogan was formally charged with violating Amtrak's policies regarding (1) Discrimination (including Harassment); (2) Attending to Duties (distracting self and others from responsibilities); and (3) Professional and Personal Conduct (proscribing fighting, rudeness, assault, and intimidation). (Herndon Decl., attached hereto as Exhibit E, ¶ 1, Ex. A). Pursuant to the DRO's recommendation, Amtrak sought Mr. Hogan's termination. (Washington Dep., Ex. B, p. 182-83). Mr. Hogan resigned in writing on March 15, 2001 rather than attend the scheduled disciplinary hearing. (Herndon Decl., Ex. E, ¶ 2, Ex. B). Plaintiff admits that he was and is satisfied with Amtrak's response to his allegations against Mr. Hogan. (Washington Dep., Ex. B, pp. 183-85).

### E.    Plaintiff's Applications For Assistant Engineer Positions.

After leaving the Amtrak Division, Plaintiff claims that he submitted applications for promotion to an Assistant Engineer positions in Amtrak's New York, Delaware, Washington, D.C. and Philadelphia Divisions.[5] (Id. at pp. 190-203). Plaintiff believes that he was denied the Delaware, New York and Philadelphia positions because of his race. (Id.). He testified that he was unsure of whether or not he believed he was denied the Washington, D.C. position because of his race. (Id.). Amtrak has explained that Plaintiff was denied each of these jobs because more qualified applicants were selected. (Id.).

With respect to each of these positions, it is undisputed that Plaintiff does not know who received the jobs instead of him. (Id.). The sole reason he believes that Amtrak

---

[5]    Plaintiff also claims that he applied for a job in Amtrak's Albany Division, but he acknowledged that Amtrak did not discriminate against him because of his race in denying him that position. (Washington Dep., Ex. B, pp. 190-91).

discriminated against him because of his race in denying him these positions is that minority co-workers told him that they believed it was difficult for African American's to get these jobs. (Id.).

### F.    Plaintiff's Additional Race And National Origin Discrimination Claim.

Plaintiff also claims that he did not receive a boom truck operator position in the Lancaster Division in September 1999. Plaintiff has taken almost no discovery regarding this claim and can adduce no evidence that Amtrak's decision not to assign Plaintiff this job was for other than legitimate discriminatory reasons.

## III.    ARGUMENT

### A.    Plaintiff Cannot Avoid Summary Judgment With Conclusory Allegations And Mere Speculation.

Federal Rule of Civil Procedure 56 mandates the entry of judgment against a party who fails to offer admissible evidence sufficient to establish the existence of every element essential to that party's case and on which that party bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 327 (1986) (noting also that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"). Once a moving party demonstrates a lack of evidence to support the non-moving party's claims, the non-moving party is required to present competent evidence that shows a genuine issue for trial. See id. at 324. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Rather, a dispute must exist over a material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). To survive a motion for summary judgment, Plaintiff must come forward with specific, admissible evidence to support each element of his case; mere

conclusory allegations are not enough. See Schoch v. First Fidelity Bancorporation, 912 F.2d

654, 657 (3d Cir. 1990). Speculation, without proof, is likewise insufficient. See Robertson v.

Allied Signal, Inc., 914 F.2d 360, 382 (3d Cir. 1990).

Under these standards, the undisputed record shows that Plaintiff has adduced

insufficient evidence to raise a triable issue on any of his claims, and the Court should grant

summary judgment for Amtrak.

**B.** **Plaintiff's Racial Harassment Claims Must Fail Because Plaintiff Cannot Establish The Existence Of Respondeat Superior.**

To state a claim for co-worker harassment under Title VII, Plaintiff must establish

that: (1) he suffered intentional discrimination because of his race or national origin; (2) the

discrimination was "pervasive and regular" (3) he was adversely affected by the discrimination;

(4) the discrimination would adversely affect a reasonable person of the same race or national

origin; and (5) respondeat superior liability applies.[6] Cardenas v. Massey, 269 F.3d 251, 260

(3d Cir. 2001); Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001); Kunin v. Sears,

Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999), cert. denied 528 U.S. 964 (1999). This

analysis applies for hostile work environment claims under the PHRA and § 1981, as well as

Title VII.[7] See Sherrod v. Philadelphia Gas Works, No. 02-2153, 2003 WL 230709, *5 (3rd Cir.

---

[6]     Race-based hostile work environment claims are evaluated under the same analysis used for gender-based claims. See West v. Philadelphia Electric Co., 45 F.3d 744, 753 n. 7 (3d Cir. 1995). Accordingly, this memorandum cites both race and gender cases in discussing Plaintiff's abject failure to adduce any evidence that the respondeat superior requirement could be met here.

[7]     Plaintiff's national origin claim is premised upon his African decent. (See Washington Dep., Ex. B, pp. 215-16). As such, he admitted that his national origin discrimination and harassment claims are premised upon exactly the same allegation. (Id.). Accordingly, Amtrak addresses the national original and race claims together throughout this Memorandum.

Jan 14, 2003) (citing <u>Harley v. McCoach</u>, 928 F.Supp. 533, 538 (E.D. Pa. 1996)); <u>see</u> <u>also</u>

<u>Goosby v. Johnson & Johnson Med. Inc.</u>, 228 F.3d 313, 317 n. 3 (3d Cir. 2000).

     Plaintiff has failed to adduce any evidence in support of the fifth prong of his

prima facie case.[8]  It is axiomatic that "an employer is not always liable for a hostile work

environment." <u>Kunin</u>, 175 F.3d at 293; <u>see</u> <u>also</u> <u>Weston</u>, 420 F.3d at 426-27 (stating "[u]nder

our jurisprudence, the [defendant's] failure to prevent an act of co-worker harassment, in and of

itself, does not end the hostile environment inquiry.").  To establish the existence of respondeat

superior in cases, such as this one, in which co-workers are the alleged harassers, "a plaintiff

must demonstrate that the employer failed to provide a reasonable avenue for complaint, or, if

the employer was aware of the alleged harassment, that it failed to take appropriate remedial

action." <u>Weston</u>, 251 F.3d at 427 (citations omitted).  "Essentially, the inquiry is whether the

employer itself was negligent in failing to put a stop to an employee's harassing behavior." <u>Allen</u>

<u>v. Nat'l R.R. Passenger Corp.</u>, 90 F.Supp.2d 603, 610 (E.D. Pa. 2000), <u>aff'd</u>, 254 F.3d 1077 (3d

Cir. 2001).

     Plaintiff comes nowhere near meeting this burden.  To the contrary, rather than

suggesting negligence on the part of Amtrak, the undisputed evidence shows that Amtrak took

immediate action upon receiving Plaintiff's harassment complaint and did everything in its

power to remedy that harassment.  As an initial matter, and as set forth in detail in the statement

of undisputed facts, Amtrak maintained and maintains a strict policy prohibiting racial

harassment that is distributed to all employees.  Plaintiff was aware of this policy and had been

---

[8]     For the purposes of this Motion only, Amtrak does not contest that Plaintiff has adduced
some evidence in support of the first four prongs of the analysis.

trained by Amtrak on the Company's commitment to providing its employees with a workplace free of discrimination.

As set forth in detail in the above statement of undisputed facts, Plaintiff made his first – and only –complaint regarding racial harassment and discrimination to Amtrak on December 1, 2000. (Washington Dep., Ex. B, pp. 174-75, 220-22). In that verbal complaint, and his written follow-up to Amtrak's DRO, Plaintiff allegations solely concerned alleged harassment by his co-worker, Mr. Hogan. (Id.) Upon receipt of Plaintiff's complaint, Amtrak acted swiftly and effectively and in full compliance with its obligations under both its policies and federal and state law. Mr. Reading immediately conducted a fact-finding into Plaintiff's allegations and reported the complaint to his supervisor. (Reading Dep., Ex. C, pp. 42-43). Within one business day, Amtrak's DRO was advised of Plaintiff's complaint and began its detailed investigation. (Washington Dep., Ex. B, p. 171, Ex. 9). The DRO interviewed Plaintiff, his co-workers and Mr. Reading. (McCallum Decl., Ex. A, ¶¶ 9-11, Ex. 5). Its investigation focused on assessing the validity of his complaints and correcting any alleged harassment by Mr. Hogan. (Id.).

The DRO determined that Plaintiff's complaints had merit. (Id.). As a result, Amtrak charged Mr. Hogan with violations of its harassment and discrimination policies, as well as other policies governing workplace behavior. Pursuant to the DRO's recommendation, Amtrak sought Mr. Hogan's termination. (Washington Dep., Ex. B, p. 182-83). Mr. Hogan resigned in writing rather than contest those charges. (Herndon Decl., Ex. E, ¶ 2, Ex. B). Importantly, Plaintiff never worked with Mr. Hogan at any time after he made his complaint about Mr. Hogan on December 1, 2000. (Washington Dep., Ex. B, pp. 183-85). Indeed, Plaintiff admits that he was and is satisfied with Amtrak's response to his allegations against Mr. Hogan.

(Id.).  More significantly, Plaintiff never made any other complaint to anyone in Amtrak

management about harassment or discrimination again.  (Id. at pp. 174-176).

        As the above demonstrates, Plaintiff simply cannot establish negligence on the

part of Amtrak.  In fact, Amtrak, promptly and effectively – pursuant to its strict policy against

harassment – redressed Plaintiff's complaint of harassment.[2]  The Third Circuit's decision in

Weston, supra, is illustrative.  In that case, as here, the plaintiff officially complained about a co-

worker's conduct.  Weston, 420 F.3d at 426-27.  The defendant investigated the allegations and

issued the alleged harasser a written reprimand for violating its policies against sexual

harassment.  Id.  Noting that the plaintiff did not allege that the offensive conduct continued after

the reprimand, the court affirmed the district court's grant of summary judgment on the grounds

that the plaintiff could not establish respondeat superior liability.  Id.  The court stated, "an

effective grievance procedure – one that is known to the victim and that timely stops the

harassment – shields the employer from Title VII liability for hostile environment. . . . Moreover,

when an employer's response stops the harassment, there can be no employer liability under

Title VII."  Id. at 427 (citations omitted); see also Barbosa v. Tribune Co., Civ. A. No. 01-1262,

2003 WL 22238984 (E.D. Pa. Sept. 23, 2005) (granting summary judgment on the plaintiff's

racially hostile work environment claims where employer issued reprimands in response to

plaintiff's complaints and plaintiff was not harassed by the employees about whom he

---

[2]    During the course of this litigation, Plaintiff has testified about other incidents that he
believed constituted harassment.  These incidents all occurred during Plaintiff's first two
stints at the Lancaster Division and did not involve Mr. Hogan.  Plaintiff, however, never
complained about these incidents.  As such, Amtrak had no notice of the alleged
harassment and respondeat superior liability cannot attach.  See Koschoff v. Henderson,
109 F.Supp.2d 332, 348 (E.D. Pa. 2000), aff'd. 2002 WL 1271631 (3rd Cir. 2002)
(holding that no respondeat superior liability exists for allegedly harassing conduct about
which the plaintiff did not complain to management).

complained again); Adefumi v. City of Philadelphia, Free Library, No. Civ. A. 01-5565, 2003

WL 21956417 (E.D. Pa. July 17, 2003) (granting summary judgment on the plaintiff's racially

hostile work environment claims where the plaintiff admitted that the employer tried to stop the

harassment).

Like the defendant in Weston, Amtrak promptly and effectively remedied

Plaintiff's complaints of harassment. Plaintiff never again worked with Mr. Hogan and never

again complained to Amtrak about harassment or discrimination. Accordingly, Plaintiff is

entirely unable to establish respondeat superior liability and the Court should grant summary

judgment for Amtrak.

**C.     The Court Should Grant Summary Judgment On The Disparate Impact Claim In Count IV Of Plaintiff's Complaint.**

In Count IV of Plaintiff's Complaint, Plaintiff asserts a claim for "unlawful

employment practices." Amtrak initially moved to dismiss this claim on the grounds that the

PHRA preempts a common law claim for unlawful employment practices.[10] Plaintiff, however,

represented that the allegations in Count IV of the Complaint are grounded solely in Title VII.

(See Plaintiff's Memorandum of Law in Opposition to Defendant's Partial Motion to Dismiss,

dated September 9, 2002, p. 7). Plaintiff also represented that Count IV "alleges that the

defendant maintains an employment policy, practice or election criteria which is facially neutral,

but which has a disparate impact on African –Americans." (Id. at p. 6) (emphasis added). The

only employment practice identified by Plaintiff at that time was an alleged policy that Plaintiff

---

[10]     Section 1981 "can be violated only by purposeful discrimination." General Building Contractors Ass'n, Inc., v. Pennsylvania, 458 U.S. 375, 391 (1982). Under § 1981, a plaintiff can only bring a claim for disparate treatment, not disparate impact. Id. Thus, to the extent that Plaintiff is attempting to assert a disparate impact theory under § 1981, summary judgment is appropriate.

claimed is applied in the Lancaster Division and other Amtrak divisions that "require[s] that a person live at or near the Division in which they are employed . . ." (Id.).

At his deposition, however, Plaintiff admitted (1) that the challenged policy applied only to Assistant Engineer positions, and (2) that only Amtrak's New York Division has a policy requiring applicants to work within 60 miles of the Division.  Specifically, Plaintiff alleges – without any support – that individuals applying for Assistant Engineer positions in the New York Division must live in or near 60 miles of the Pennsylvania Station in New York City. (Washington Dep., Ex. B, pp. 191, 198 (wherein the following exchange took place: "Q: So D.C., as far as you know, didn't have a 60-mile radius restriction?  A: "No.  The only one that had it was New York.  I checked on it.") (emphasis added)).  Contrary to his prior representation to the Court that he would attempt to do so, Plaintiff has adduced no evidence that Amtrak's Lancaster Division has a policy requiring its employees to live in or near Lancaster, Pennsylvania.  In fact, it is undisputed that Plaintiff worked in that Division while he lived in Upper Darby, Pennsylvania.[11]   (Id. at p. 30.)

To establish a prima facie case of disparate impact discrimination, Plaintiff must demonstrate that application of a facially neutral standard has caused a "significantly discriminatory hiring pattern."  Newark Branch, N.A.A.C.P. v. City of Bayonne, 134 F.3d 113, 120-21 (3rd Cir. 1998) (citing, inter alia, Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642,

---

[11]    In any event, given that Plaintiff worked in Lancaster, Plaintiff could not have been adversely affected by any alleged policy in Lancaster requiring workers to live in or near Lancaster.  As such, Plaintiff has no standing to pursue a disparate impact claim regarding this alleged, and nonexistent, Lancaster policy.  See, e.g., Verney v. Dodaro, 872 F.Supp. 188, 194 (M.D. Pa. 1995) aff'd 79 F.3d 1140 (3d Cir. 1996) (holding that a plaintiff who was not affected by policy with allegedly disparate impact had no standing to challenge that policy) (citing Robinson v. Polaroid Corp., 732 F.2d 1010, 1016 (1st Cir. 1984) (plaintiff in disparate impact claim must have been injured through execution of the policy)).

657 (1989); Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641 (3rd Cir. 1993) (granting

motion to dismiss where plaintiff did not "identify a specific employment practice of the

defendant and demonstrate that its application had a disparate impact on a protected class").

Moreover, Plaintiff must "demonstrate that the disparity [he] complains of is the result of one or

more of the employment practices that [he is] attacking here, specifically showing that each

challenged practice has a significantly disparate impact on employment opportunities for

[members of his protected class] and [individuals not in his protected class]." Wards Cove, 490

U.S. at 657.

     The evidence in disparate cases focuses on statistical disparities.  City of

Bayonne, 134 F.3d at 121; see also Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792,

798 (3d Cir. 1991) (holding that a plaintiff usually must prove that the challenged practice has an

adverse impact on a protected group through statistical analysis).  In general, a plaintiff must

show a reasonably refined statistical comparison between the racial composition of the jobs at

issue and the racial composition of the qualified population in the relevant labor market.  Wards

Cove, 490 U.S. at 650-51.

     Here, Plaintiff is utterly unable to support his disparate impact claim.  He has

adduced no statistical evidence regarding the impact of Amtrak's New York Division's alleged

policy on African American and/or Caucasian employees.[12]  Indeed, Plaintiff acknowledged that

it is highly unlikely, given the high minority population of New York City, that the alleged 60-

---

[12]     To the extent Plaintiff attempts to ignore the admissions made at his deposition and claim
that divisions other than New York – including the Lancaster Division – have a policy
restricting applicants, his disparate impact claim regarding those policies will fail for this
same reason.  Specifically, Plaintiff has made no effort to determine the impact of any
alleged policy on African American and Caucasian applicants.  Without such an analysis,
Plaintiff resorts to rank speculation to suggest that these policies have a disparate impact
on African Americans.

mile radius requirement of the New York Division – the only Division that Plaintiff alleges has

such a policy – would disparately impact African American candidates for jobs. (Washington

Dep., Ex. B, pp. 192-93). In any event, the fact that the parties must resort to such pure

speculation on the very statistical analysis required to prove disparate impact demonstrates that

Plaintiff has failed to adduce evidence in support of his disparate impact claim. See, e.g.,

Verney, 872 F.Supp. at 194 (granting summary judgment and holding that bare conclusions are

insufficient to establish a prima facie case of disparate impact). Accordingly, Amtrak

respectfully requests that the Court grant summary judgment on the disparate impact claim in

Count IV of Plaintiff's Complaint.

**D.      The Court Should Dismiss Plaintiff's Discrimination Claims In Connection With
         The Boom Truck Operator And Assistant Engineer Positions.**

Plaintiff challenges Amtrak's decision not to assign him to an Assistant Engineer

position in four Amtrak Divisions: (1) New York; (2) Washington, D.C.; (3) Delaware; and (4)

Philadelphia.[13] Plaintiff also claims that in September 2000 he did not receive a Boom Truck

operator position in Lancaster because of his race and national origin. Notwithstanding the broad

scope of his allegations, Plaintiff cannot point to any evidence to support his claims of race and

national origin discrimination.

A plaintiff who brings an action under Title VII, the PHRA or § 1981 bears the

ultimate burden of proving intentional discrimination by a preponderance of the evidence.[14]

---

[13]    Throughout this litigation, Plaintiff has been unable or unwilling to provide any
specificity about the positions for which he claims he was denied promotion because of
his race. At his deposition, he admitted that he does not recall the dates of his application
for these challenged positions. (Washington Dep., Ex. B, p. 189).

[14]    The same general standards and analyses are applicable to Plaintiffs' Title VII, PHRA
and § 1981 race discrimination claims. See Jones v. Sch. Dist. of Philadelphia, 198 F.3d
403, 410-11 (3rd Cir. 1999) (holding that §1981, Title VII and PHRA are analyzed under

20

Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).  Plaintiff's burden of proof is governed by the framework erected by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and clarified in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  Martin v. Healthcare Bus. Res., No. 00-3244, 2002 WL 467749, *5 (E.D. Pa. March 26, 2002).  If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the employer, who must merely articulate a legitimate, non-discriminatory reason for the employee's discharge.  Burdine, 450 U.S. at 254; Martin 2002 WL 467749, at *5.  Once the defendant meets this minimal burden of production, the burden shifts back to Plaintiff who "must demonstrate that the proffered reason [is] pretextual."  Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 282 (3rd Cir. 2001).

When analyzed against this legal framework, none of Plaintiffs' claims of race discrimination can survive summary judgment.

1.     **Plaintiff Cannot Prove A *Prima Facie* Case To Support His Race Discrimination Claims.**

To establish a *prima facie* case of race discrimination, Plaintiff must prove that: (1) he is a member of a protected class; (2) he is qualified for the position the sought; (3) he suffered an adverse employment action; and (4) the surrounding circumstances give rise to an inference of discrimination.  See King v. Sch. Dist. of Philadelphia, No. 00-CV-2503, 2001 WL

---

same framework).  For the purposes of it Motion for Summary Judgment, therefore, Amtrak's arguments with respect to Plaintiff's failure to prove his race and national origin discrimination claims apply with equal force under Title VII, PHRA and § 1981.

856948 (E.D. Pa. July 26, 2001) (quoting Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352-54 (3rd Cir. 1999)).  Plaintiffs cannot prove a *prima facie* case with respect to any of his claims.

      a)      <u>The Boom Truck Position.</u>

          (1)    <u>Plaintiff Did Not Apply For The Boom Truck Driver Position And, Therefore, He Was Not Qualified For The Same.</u>

As set forth in detail in the statement of undisputed facts, Amtrak employees are required to formally bid for BMWE position.  Bids for such positions in the Lancaster Division are made directly to an assignment office in Philadelphia and are awarded out of that office based upon seniority and qualifications.  (Reading Dep., Ex. C, p. 19).  Plaintiff acknowledges that he did not submit a formal bid for the Boom Truck Driver position.[15]  (Washington Dep., Ex. B, pp. 78-79 (wherein Plaintiff testified as follows:  Q:  Did you bid for the position?  A: You can't bid if you are not qualified.").  As Plaintiff did not bid for the position, pursuant to the Amtrak's unambiguous policies, he was not qualified to receive the Boom Truck Operator job.  As such, he cannot prove even a prima facie case of discrimination on this claim.

          (2)    <u>Even If Plaintiff Had Been Improperly Denied The Boom Truck Job – Which He Was Not – His Failure To Get That Position Was Without Consequence.</u>

Assuming, *arrguendo*, that Plaintiff had been improperly denied the Boom Truck job in Lancaster, that decision had no impact on Plaintiff's employment with Amtrak.  As Plaintiff admits, the Boom Truck job and the Bus Driver job in which he worked paid exactly the same amount.  (Washington Dep., Ex. B, p. 80).  Plaintiff was working as a Bus Driver when Mr. Lewis, whom Plaintiff claims was improperly given the job (with no factual support), began

---

[15]    Instead, Plaintiff testified that because he was not qualified on the Boom Truck he asked Mr. Reading, in writing, to qualify him for the job.  (Washington Dep. Ex. B, pp. 72-80).  Notwithstanding the fact that Plaintiff never made any such request to Mr. Reading, and

operating the Boom Truck.  (Id.).  Moreover, by December 19, 2000, Mr. Lewis had been

bumped out of that job by an individual with more seniority than either Plaintiff or Mr. Lewis.

(Reading Decl., attached hereto as Exhibit F, ¶¶ 1-4).  Plaintiff voluntarily bid out of the Bus

Driver position and onto a traveling gang before returning to the Lancaster Division and again

working in the Bus Driver position as recently as three weeks prior to this event.  (Washington

Dep., Ex. B, pp. 50-51, 80).  As such, Plaintiff would have not have held the Boom Truck job

any longer than he did the Bus Driver job, from which he was bumped from on December 4,

2000.

          In short, Plaintiff's reference to the Boom Truck job is a red herring.  Even if true,

his claim that he improperly failed to receive this job is entirely without any practical

consequence.  Accordingly, Plaintiff cannot make out even a prima facie case of race

discrimination through reliance on his claims concerning the Boom Truck position.

        b)     The Assistant Engineer Positions.

          Plaintiff cannot sustain a prima facie case of race discrimination regarding

Amtrak's decisions not to provide him with any Assistant Engineer position. Plaintiff has

adduced no evidence giving rise even to an inference that he was denied promotion to any of the

Assistant Engineer position about which he complains because of his race.  Indeed, Plaintiff

admits that he does not even know who received any of the Assistant Engineer positions for

which he applied.  (Washington Dep, Ex. B, pp. 190-203.)

          Tellingly, Plaintiff has taken no deposition about Amtrak's decision not to

provide Plaintiff with an Assistant Engineer positions he sought.  Nor has he made any effort to

---

he has no documentation supporting the alleged request, it is undisputed that such a
request does not constitute a bid under the terms of the BMWE contract.

determine why others were selected to fill these positions. In fact, the only reason that he

believes that his race was a factor in Amtrak's decision not to offer him the Assistant Engineer

positions is because of vague statements allegedly made by some of his co-workers that "it is

harder for us to get in there." (Id. at 189) "To make out a *prima facie* case of discrimination

requires more than . . . speculation" See Bullock v. Children's Hosp. of Philadelphia, 71

F.Supp.2d 482, 489 (E.D. Pa. 1999). Plaintiff's unsubstantiated opinion – and the alleged

opinions of co-workers with whom he spoke – simply does not create an inference that Amtrak's

decision not promote Plaintiff to position of Assistant Engineer was discriminatory.

> 2.    **Amtrak Has Articulated Legitimate Nondiscriminatory Reasons For Not Promoting Plaintiff To The Challenged Positions.**

Even if Plaintiff could assert a *prima facie* case of discrimination, Amtrak has

demonstrated legitimate nondiscriminatory reasons for its decisions not to hire Plaintiff to the

Boom Truck Operator position and the four Assistant Engineer positions.

> a)    **The Boom Truck Position.**

It is undisputed that Plaintiff never properly bid for the Boom Truck Operator

position as required by the BMWE contract. (Washington Dep., Ex. B, pp. 78-79). As such,

Amtrak was not permitted, under the terms of the contract, to provide Plaintiff with training for

the position or with the position itself. (BMWE Contract, Ex. D, Rule 1 p. 25).

> b.    **The Assistant Engineer Positions.**

Amtrak has met its burden of demonstrating the legitimate nondiscriminatory

reasons for its decisions not to assign Plaintiff to Assistant Engineer positions in New York,

Delaware, Philadelphia and Washington, D.C. As Plaintiff himself testified, Amtrak advised

Plaintiff that he did not receive these Assistant Engineer positions because other, more qualified

candidates applied for these positions. (Washington Dep., Ex. B, pp. 194, 198-99). Indeed,

Plaintiff acknowledged that he does not know the race or qualifications of the individuals who did receive these positions. (Id. at p. 196).

3.    Plaintiffs Have Adduced No Evidence That Amtrak's Legitimate
      Nondiscriminatory Reasons For Its Decisions Were Pretextual.

As Amtrak is able to meet its burden of production, the burden shifts back to Plaintiff to "produce sufficient evidence to 'allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons' was a pretext." Cohen v. Pitcairn Trust Co., No. Civ. A. 99-5441, 2001 WL 873050, at *5 (E.D. Pa. June 20, 2001) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3rd Cir. 1994)); see also Abramson, 260 F.3d at 282.  The evidence of pretext must show

> such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for the asserted non-discriminatory reasons.'

Gourley v. Home Depot, No. CIV. A. 99-5728, 2001 WL 755102, at *2 (E.D. Pa. June 29, 2001) (quoting Fuentes, 32 F.3d at 765).

a)    The Boom Tuck Position.

Plaintiff cannot produce any evidence that Amtrak's administration of the Boom Truck Operator position in accordance with the BMWE contract was discriminatory.  Although Plaintiff claims that he asked Mr. Reading to train him on the Boom Truck, it is undisputed that Plaintiff did not bid for the position as required by the BMWE contract.  (Washington Dep., Ex. B, pp. 78-79).  Furthermore, Plaintiff has not produced any evidence showing that Al Lewis, the individual who received the position, did not bid for the position as required by Amtrak policies. Plaintiff's subjective belief regarding how Mr. Lewis became qualified for the position does not help him prove pretext. See, e.g., Martin, 2002 WL 467749 at *6 ("Plaintiff's mere

25

pronouncement or subjective belief that she was terminated because of her race, gender and age is not a substitute for competent evidence."); Osuala v. Comty. Coll. of Philadelphia, No. Civ. A. 00-98, 2000 WL 1146623 (E.D. Pa. Aug. 15, 2000) (holding that plaintiff failed to demonstrate pretext where she provided nothing more than blanket assertions that discrimination was the reason for her termination).

            b)       The Assistant Engineer Positions.

Similarly, Plaintiff has no evidence that Amtrak's determination that he was not as qualified as other Assistant Engineer applicants was a pretext for discrimination. In fact, Plaintiff has not made any effort to establish pretext during paper discovery in this case. Nor has taken a single deposition aimed at determining Amtrak's motivations for hiring the individuals who received the Assistant Engineer positions. Indeed, Plaintiff admits that he does not know who received the Assistant Engineer positions at issue or what qualifications those individuals possessed. (Washington Dep., Ex. B, pp. 190-202). Instead of compiling facts to support his claim, Plaintiff relied exclusively on his speculation, and the vague statements of some of his co-workers. With discovery complete, this speculation is not enough to overcome summary judgment.

In short, Plaintiff has no evidence to support his claims of pretext under Title VII, § 1981, or the PHRA. As such, these claims must fail.

## IV.    **CONCLUSION**

For the forgoing reasons, Defendant National Railroad Passenger Corporation respectfully requests that the Court grant its Motion for Summary Judgment Against Plaintiff and dismiss all remaining claims with prejudice.

Judith E. Harris, Esquire ( I.D. #02358)
William J. Delany (I.D. #74864)
Paul C. Evans (I.D. #84535)
1701 Market Street
Morgan, Lewis & Bockius LLP
Philadelphia, Pennsylvania 19103
(215) 963-5000

Attorneys for Defendant
National Railroad Passenger Corporation

Dated:  October 30, 2003