**ARMANDO A. PANDOLA, JR.**
**Identification No.: 27608**
**400 Sterling Commerce Center**          **ATTORNEY FOR PLAINTIFF**
**1819 JFK Boulevard**
**Philadelphia, Pa  19103**
**(215) 568-5010**

---

**JEROLD WASHINGTON**                **UNITED STATES DISTRICT COURT**
                                      **FOR THE EASTERN DISTRICT OF**
        **Vs.**                       **PENNSYLVANIA**

**NATIONAL RAILROAD PASSENGER**      **CIVIL ACTION NO.  02-CV-4451**
**CORPORATION D/B/A AMTRAK**

<u>**ORDER**</u>

　　　　**AND NOW, this            day of                            , 2003, it is**

**hereby ORDERED and DECREED that Defendant's Motion for Summary**

**Judgment is denied.**

**BY THE COURT:**

_____
                                                              **J.**

**ARMANDO A. PANDOLA, JR.**
**Identification No.: 27608**
**400 Sterling Commerce Center**          **ATTORNEY FOR PLAINTIFF**
**1819 JFK Boulevard**
**Philadelphia, Pa  19103**
**(215) 568-5010**

---

| | |
|---|---|
| **JEROLD WASHINGTON** | **UNITED STATES DISTRICT COURT** |
| | **FOR THE EASTERN DISTRICT OF** |
| **Vs.** | **PENNSYLVANIA** |
| | |
| **NATIONAL RAILROAD PASSENGER** | **CIVIL ACTION NO.  02-CV-4451** |
| **CORPORATION D/B/A AMTRAK** | |

### PLAINTIFF'S ANSWER TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.  Admitted in part; denied in part.  It is admitted that plaintiff worked for Amtrak and that in December, 2000, he filed an Internal Complaint of racial harassment.  Furthermore, it is admitted that the defendant investigated plaintiff's complaint and determined that plaintiff was justified in bringing his complaint.  As a result of the investigation, only one individual was charged with a violation of defendant's racial harassment policies and that individual resigned before the hearing concerning those charges began.  All other facts are in dispute.

2.  Admitted in part; denied in part.  It is admitted that the plaintiff did

not work with Mr. Hogan after he filed his complaint.  It is specifically denied that plaintiff was satisfied with the results of what occurred.  In fact, it was clear that the harassment that was initiated by Mr. Hogan could not

have taken place but for an atmosphere of racial harassment that existed at the Lancaster Division.  This atmosphere of racial animosity against African-Americans was exemplified by the fact that when plaintiff brought these accusations against Mr. Hogan every member of the Lancaster Division supported Mr. Hogan rather than the plaintiff.  Numerous statements were taken from individuals and those statements clearly indicated that the individuals working at the Lancaster Division lied and twisted the facts in order to support Mr. Hogan.  Additionally, the investigation revealed that the supervisors at this location did nothing to advance the corporate policy of racial diversity and, in fact, openly supported the racists who worked at the Lancaster Division.  One of these supervisors has testified that when he hears racial jokes or comments, he turns the other way.  By not participating in the racial harassment, he believes that he has done nothing wrong; in fact, he has failed to administer the anti-discrimination policies of the defendant which requires supervisors to report any violation of that policy.  In fact, every supervisor who has been deposed has admitted that they have done nothing to enforce that policy.  The evidence shows that the defendant gives mere lip service to its anti-racial discrimination policy.

3.  Admitted in part; denied in part.  Plaintiff's complaint speaks for itself.

4.  Denied.  Any reasonable fact-finder must conclude that

defendant has failed to effectively put into practice its alleged policy of non-discrimination of African-Americans and other minorities.  Defendant's prosecution of Mr. Hogan has done nothing to remedy the situation that existed and still exists at Lancaster Division where blacks are practically non-existent because of the hostile atmosphere that minorities must endure to work at this location.

5.   Denied.  For the first several months of this litigation, defendant denied that the position of boom truck driver even existed.  Thereafter, it denied that the plaintiff applied for any jobs.  In fact, it responded to the EEOC by wrongfully stating that plaintiff never bid on any jobs.  Now, at the conclusion of the litigation, defendants have finally forwarded information that indicates that plaintiff has applied for over twenty jobs.  Regarding the boom truck driver position, plaintiff has testified that an individual who did not have a commercial vehicle license was given this position and then trained on it and that he was not given an opportunity to apply for the job. This is in direct contravention to the proper policies and procedures that defendant had agreed to as a result of the <u>Thorton</u> Decree.

6.   Denied.  Plaintiff has requested information concerning the number of assistant engineer positions that exist in each of the defendant's divisions, and the number of African-Americans who have those positions at each division.  Plaintiff requested this information so that a determination could be made if there was a correlation between the number of minorities who hold assistant engineer provisions in each of the

defendant's local divisions, and that local division's policy as to where the assistant engineer must live.  Plaintiff requested this information at Request No. 24.  It never received this information.

7.  Denied.  Defendant's general allegation that all claims asserted by

the plaintiff, even those which are not addressed in defendant's Motion for Summary Judgment, should be dismissed is without merit, and contrary to the rules concerning Motions for Summary Judgment.

8.  In support of its opposition to defendant's Motion for Summary Judgment, plaintiff incorporates the attached memorandum of law.


WHEREFORE, plaintiff respectfully request that this Honorable Court deny defendant's Motion for Summary Judgment.


Respectfully submitted by,


ARMANDO A. PANDOLA, JR., ESQUIRE
Attorney for Plaintiff

**ARMANDO A. PANDOLA, JR.**
**Identification No.: 27608**
**400 Sterling Commerce Center**          **ATTORNEY FOR PLAINTIFF**
**1819 JFK Boulevard**
**Philadelphia, Pa  19103**
**(215) 568-5010**

---

| | |
|---|---|
| **JEROLD WASHINGTON** | **UNITED STATES DISTRICT COURT** |
| | **FOR THE EASTERN DISTRICT OF** |
| **Vs.** | **PENNSYLVANIA** |
| | |
| **NATIONAL RAILROAD PASSENGER** | **CIVIL ACTION NO.  02-CV-4451** |
| **CORPORATION D/B/A AMTRAK** | |

## MEMORANDUM OF LAW

I.      **Statement of Facts**

On May 10, 1999, plaintiff began working for the defendant as a trackman.  In December, 1999, he was transferred to the Lancaster Division for the first time.  He was sent to the Lancaster Division to perform the duties of a bus driver.  As soon as he arrived, he was told to leave since a more senior person was going to be given the job.  This was Lancaster Division's first attempt to remove Mr. Washington from the division by failing to give to him a job for which he was entitled and qualified.

The Lancaster Division has two branches, one in Harrisburg and one in Lancaster.  Plaintiff was always assigned to the Lancaster branch.  In Lancaster, he was the only minority who was working "outside", that is, in a non-office position.

Two weeks later, he returned to the Lancaster Division as the bus driver.  The person who had more seniority than him who had been acting as the bus driver for the past two weeks was, in fact, not qualified since he

did not have a commercial driver's license.  It was only when this individual

was fined and his license suspended by the Pennsylvania Department of

Transportation that the Lancaster Division agreed that the plaintiff could

act as the bus driver instead of this individual (Washington, 18-19).

After serving as the bus driver at the Lancaster Division for

approximately three months, plaintiff was transferred out of the Lancaster

Division (Washington, 22)[1].

In August, 2000, he returned to the Lancaster Division but only

stayed there for approximately one month because of the racial hostility

that existed there (Washington, 26-50).  Mr. Washington was subject to a

series of incidents at the Lancaster Division, on almost a daily basis, that

made clear the hostile working environment at the Lancaster Division for

African-Americans and minorities.  There were numerous occasions on

which Mr. Washington noticed that Caucasian employees would ask

questions and would be given assistance by co-workers whereas, if he

asked a question, he was told that he would have to go to the foreman, and

not to bother people.  There were many jokes and other instances of

inappropriate comments made by co-workers.  These included referring to

African-Americans as  "raccoons".  There were references to Mr.

Washington having a late model car and the fact that he must be doing

---

[1] Plaintiff has attached an Exhibit summary for the convenience of the Court.  All
documents or depositions referenced in this Answer may be found in the Exhibits except
for the deposition of Andrew McCullom which was taken after defendant filed this Motion.
McCollum's deposition had been scheduled several weeks ago, but he failed to appear.
Plaintiff's counsel certifies that all references to McCollum's testimony are true and
correct and that a copy of his deposition will be forwarded to the Court as soon as it is
received.

some other kind of business, possibly drugs.  Mr. Washington rightfully perceived that his co-workers' comments concerning inner-city life were meant to reflect poorly upon him and other African-Americans.  Also, because of the defendant's policy of allowing more senior people to "bump" less senior people out of jobs, Mr. Washington noticed that everyone became very aware of his start date so that they could notify a Caucasian with more seniority that Mr. Washington could be bumped out of Lancaster.

Plaintiff returned to the Lancaster Division in the Fall of 2000.  He was working as a trackman and a bus driver.  The racial incidents became more intense and culminated when a co-worker, Hogan, talked about "exterminating" African-Americans and sought to place a noose around Mr. Washington's head.

When Mr. Washington complained of this incredible behavior, an investigation was begun of this matter.

During the course of this investigation, defendants interviewed plaintiff's co-workers at the Lancaster Division.  Everyone that was interviewed backed Mr. Hogan and either claimed that he was only making a bad joke or that the incident never occurred.  In fact, the foreman of the gang which included both the plaintiff and Mr. Hogan denied that the incident ever took place and has testified that he never got involved in anything concerning this incident and, in fact,:

I tried to stay out of it once it happened because even though I was the foreman and it involved – it didn't concern me. (Rhodes, 42).

The foreman of the track "gang" was Bruce Rhodes.  He verified his duties as the foreman:

11    A.    You're responsible for making sure

12    they wear their safety gear.  You're responsible

13    to make sure that there is no horseplay because

14    it increases the chance of somebody getting

15    hurt.  You're responsible to make sure that

16    everybody complies with Amtrak's rules.

(Rhodes, 22)

Rhodes was asked about what was done to ensure that the defendant's safety policies were enforced.  His answer was that the defendant effectively enforced its safety rules:

17    Q.    You mentioned safety gear, are there

18    safety rules that they have to comply with?

19    A.    Yes.

20    Q.    How do you enforce those?

21    A.    If you see somebody breaking a rule,

22    you let them know that you can't do that, it's

23    breaking a rule.  If they insist, you would stop

24    work and go to the tracks so that nobody gets

**(Rhodes, 22)**

1   hurt and then I tell Bernie and let him handle

2   it.

3      Q.      Are there briefings regarding every

4   job?

5      A.      Yes.

6      Q.      So that's part of the safety

7   features?

8      A.      Yes.

9      Q.      Are there any regular meetings

10   regarding those issues?

11      A.      Yes.

**(Rhodes, 23)**

    The contrast between defendant's safety policies and its diversity

policy is striking.  There are no regular meetings regarding its diversity

policies.  The only diversity training given to Rhodes was a one-day seminar,

mandated by the <u>Thorton</u> decree.  In fact, when Bernie Reading, the person in

charge of the Lancaster Division, was asked about training regarding

defendant's diversity policy, he could not understand the question:

      19 Q.    Now, is there any kind of special

      20 training that is done at the Lancaster division

      21  regarding Amtrak's racial diversity policy?

22    A.    I don't understand the question.

(Reading, 22)

The depositions of Bernie Reading, supervisor for the Lancaster Division, and Bruce Rhodes, foreman of the track gang to which plaintiff was assigned, present adequate evidence to defeat the defendant's Motion for Summary Judgment.

Mr. Reading testified that he, a supervisor, is charged with ensuring that the defendant's policies and procedures are enforced at the Lancaster Division.  (Reading, 13).

Regarding the statistics that are kept by defendant regarding the defendant's "diversity" policy, Mr. Reading testified that he could not even say how many minorities were at the Lancaster Division in 2000 (Reading, 14), cannot remember if plaintiff was the only African-American at Lancaster when he worked there (Reading, 17), but "believes" that he was (Reading, 48).  Most importantly, the defendant does not keep any statistics on how many African-Americans bid for jobs at Lancaster (Reading, 19).

As a supervisor, he was given two or three days training pursuant to the Thorton Decree regarding defendant's diversity policy (Reading, 23). He learned that making jokes about someone's racial or ethnic background was not permitted (Reading, 25) and stated that he never heard such jokes at the Lancaster Division by anyone (Reading, 26).  In spite of the fact that a worker under his supervision (Hogan) was found by the defendant's own investigation to have openly harassed plaintiff because he was African-

11

American, he admitted that no one at Lancaster supported the plaintiff in his accusations of racial harassment (Reading, 41).

Regarding the claim made by the plaintiff of racial hostility at the Lancaster Division, Reading, as the person in charge of the entire division, stated that he <u>never</u> saw the report issued by the Business Diversity Department that investigated the plaintiff's claims of racial harassment (Reading, 43). He has no idea what the defendant's policy is regarding his involvement in such investigation. He does not know if the supervisor of a division has a duty to review the report concerning claims of racial harassment (Reading, 44). He had his head so deeply buried in the sand that he admitted that he never asked for the report concerning the investigation of plaintiff's complaint and never wanted to see it (Reading, 44). He was never given copies of any statements made by the other co-workers who were interviewed regarding plaintiff's complaint (Reading, 60).

Regarding his own statement concerning the plaintiff's complaint, Reading admitted that he knew about the confederate flag incident in which plaintiff claimed that Hogan in the presence of co-workers pointed to a confederate flag that was on the back of a pest extermination truck and said that that flag was meant to exterminate "you'all" pointing to Washington. He never mentioned that incident in the statement that he gave (Reading, 45).

Concerning this alleged "strict policy against racial harassment and discrimination", Reading admitted that he never even tried to retrain any of

the members of the gang to which plaintiff was assigned after this incident
(Reading, 46).  There are no posters or other documents regarding the anti-
racial discrimination policy at the Lancaster Division (Reading, 47).

   Reading never saw Hogan's letter of resignation in which Hogan
essentially claimed that he did nothing wrong and denied Washington's
allegations.  In fact, Reading was given a copy of the letter which was
placed in Hogan's personnel file, but he never even bothered to read it
(Reading 48).

Reading admitted that he is the one in charge of ensuring that there
is no racial discrimination or harassment at Lancaster.   Even so, within
the Lancaster Division, no investigation was conducted concerning racial
harassment (Reading, 51).  There is no "pro-active" policy of seeking out
and eliminating racial discrimination and harassment at the Lancaster
Division but, instead, Reading admits that he sits back and waits until a
claim is made and then would send the complaint to the "Business
Diversity Office" (Reading, 52).

Reading claims that he never heard a racial remark at Lancaster.
Reading admits that he has never brought up the issue of prejudice against
African- Americans with any of the employees at the Lancaster Division to
see how they would react even though he admits that on those occasions
when he does walk among those people who work at the Lancaster
Division, he knows that they act differently than they normally do (Reading,

54).  He does nothing to attempt to determine how the employees act toward minority employees.

Contrasting what Reading does as a supervisor regarding safety with what he does regarding the diversity policy can only lead to one conclusion:  <u>the defendant enforces its safety policy but not its diversity policy</u>.  Reading goes on to explain, in detail, the "pro-active" measures that are taken by the defendant and its supervisors to enforce its safety program (Reading, 55).  Reading actively seeks out potential maintenance problems and safety problems and attempts to remedy those problems before a passenger or employee becomes injured (Reading, 55-56):

> 2    A.    We have safety meetings once a
>
> 3    month.  If there's any safety directives that
>
> 4    come out, I address it with the foreman.  Each
>
> 5    morning they have a job briefing to go over the
>
> 6    particular job they're doing, the unsafe hazards,
>
> 7    what tools they'll be using.  If there is an
>
> 8    injury on my subdivision, we go over the injury
>
> 9    in detail to prevent it from happening again.
>
> 10    Q.    What about preventative maintenance,
>
> 11    do you do that?
>
> 12    A.    The employees are instructed to
>
> 13    check all tools before they start work.
>
> 14    Q.    How about with regard to the tracks,

15    I mean what kind of safety is done with regard to

16    that to ensure that the tracks remain safe?

17    A.    I have six track inspectors, they

18    inspect the track twice a week and they report an

19    unsafe condition, I send the gangs immediately to

20    repair the unsafe condition.

21    Q.    Are gangs primary involved in that

22    type of work in repairing unsafe conditions?

23    A.    In my area?

24    Q.    In your area.

        (Reading, 55)

1    A.    In Lancaster, yes.  We are a

2    maintenance force, not a production force.

3    Q.    So gangs usually go out and when

4    they go out they're going out to repair some kind

5    of problem with the track?

6    A.    Yes.

7    Q.    You stated how you actually actively

8    find those problems by having those track

9    inspectors, so they see a problem, they report it

10    to you, you assign a gang to it, the gang goes

11    out and repairs it?

12        MR. EVANS:  Objection to the

13          form.

14                  THE WITNESS:  Yes.

                    (Reading, 56)

The most informative fact that Reading stated in his deposition was that he, himself, did not believe that the plaintiff was racially harassed but, rather, believed that it was mere "horseplay", something that is common among employees according to Reading (Reading, 60-61).

In direct contrast to this statement, Bruce Rhodes who is with the men on a daily basis and was Washington's and Hogan's immediate supervisor, testified that he has not seen "horseplay" among the employees (Rhodes, 21).  It's too dangerous.

Regarding the defendant's diversity policy, Rhodes confirmed that there was nothing ever posted at the Lancaster Division concerning that policy (Rhodes, 26).  There were no regular meetings concerning the diversity policy (Rhodes, 27).

While he believes that the plaintiff did an honest days work (Rhodes, 28), he, too, did not believe the plaintiff's accusations of racial harassment and believed that the plaintiff was just trying to make money.  He did not believe that anything happened (Rhodes, 42).

He had this belief that Mr. Washington was lying not because he did any investigation concerning Mr. Washington's claims.  When he was told about the complaint made by Mr. Washington, he never even bothered to find out from Bernie Reading the nature of the complaint (Rhodes, 33).

16

Regarding the noose that was used to intimidate Mr. Washington, Rhodes claimed that he saw the noose on the bus the day before Halloween[2] and told the employees that it had to come down.  He thought it was a Halloween prank (Rhodes, 37-40).  He never asked Hogan about the matter because "it didn't concern me" (Rhodes, 41).

In this internal statement that he gave, Rhodes claimed that he, himself, put the noose on the bus to be used at work.  Then, on Halloween, he saw the nooses on the bus.  Most tellingly, he told other gang members to take the noose down from the bus because someone might get the wrong idea:

2     Q.     What did you mean by the wrong idea?

3     A.     I just felt that maybe if somebody

4     seen a noose hanging then they may get the idea

5     that somebody else in the gang didn't want him

6     around for whatever reason.

(Rhodes, 55)

The above-stated testimony, taken under oath, is the most accurate evidence of what the noose, the extermination truck, the wrapping of his body in a chair and all of the other harassing conduct that plaintiff had to endure at the Lancaster Division were leading to – his life was being threatened.

---

[2] The 'noose' threat was made by Hogan in early December, many weeks after Halloween, October 31.  This was Rhodes attempt to explain why the noose was on the bus (just a Halloween prank) yet still back Hogan.

Working on a track gang on a railroad is a very dangerous job. Co-workers are very dependent on each other to assist each other and look out for each other. Without the cooperation of the other co-workers, it is very easy to become injured on the job; when those other co-workers are actually looking for a way to harm you, it is impossible to avoid being injured.

This evidence clearly indicates the nature of the threats that were made against Mr. Washington by the Lancaster gang. While those threats were directly made by one individual of that gang, all of the other members of that gang colluded in it by their presence, as did Mr. Rhodes, himself, as the supervisor. He was present everyday on the job and was fully aware of the conduct of the plaintiff's co-workers.

Eventually, Mr. Washington did "get the idea that somebody else in the gang didn't want him around for whatever reason." The reason was obvious. It was Mr. Washington's race.

Recently, the deposition of James Herndon was taken. Mr. Herndon was Mr. Reading's supervisor (Herndon, 12). He confirmed that he never conducted an investigation concerning this matter; in fact, he had no idea why his deposition was being taken (Herndon, 13-14). He never received a copy of the investigation concerning this matter (Herndon, 37). While he did speak with Reading, he could remember nothing of their conversation concerning it. He never spoke with anyone else concerning it. He continually complained that these events occurred years ago, and he could

not remember any conversation that he had concerning it, nor even the details of the accusations that were made by Mr. Washington.  He insisted that he could not remember anything even though he claimed that this was one of the very few complaints of racial discrimination that occurred while he has been in charge of this division (Herndon, 36).  His selective memory is part of the defendant's actual practice concerning racial harassment: do the minimum necessary then forget about it (Herndon, 19-33).

Mr. Herndon admitted that it was a violation of the defendant's policies and procedures to lie to an investigator who was conducting an investigation into a claim of racial harassment (Herndon, 38-39).  When asked for any specific information regarding defendant's policies against racial harassment and discrimination, he could not even summarize defendant's policy.  It was obvious that while he was given a cursory training course in the benefits of diversity in the workplace because of the Thorton Consent Decree, he was not given any effective training or encouraged to actually be aware and know of the defendant's policies concerning racial discrimination (Herndon, 17-19).

Regarding plaintiff's claim that a white employee was given the job of Boom Truck Operator even though it required a Commercial Driver's License (CDL) and the white employee did not have one while Washington did have one, Herndon confirmed that Washington should have been given the job, even if the white employee had more seniority because

Washington had the CDL that was a requirement of the job (Herndon, 42-43)

In Section II. A. of defendant's Memorandum of Law, defendant sets forth its policy regarding racial harassment (actually it is a policy prohibiting "sexual" harassment and discrimination).  While plaintiff agrees that defendant has such a written policy, it is totally ineffective because no one does anything to enforce it.

Defendant admits that it requires its employees to report "harassing conduct so that it can take the necessary steps to remedy the specific situation and rid its work place of such behavior" (defendant's Memorandum of Law, page 3).

This policy was violated by every member of the Lancaster gang who gave a statement, including Bruce Rhodes and Bernie Reading.  All of those employees strongly supported Mr. Hogan, and denied the allegations that were made by the plaintiff, in spite of the fact that the defendant's own internal investigation supported Mr. Washington.  It was obvious that they were lying in order to protect Mr. Hogan.  Now, the lies have become embedded in their memories.  To this very day, those who have given statements and have been deposed claim that the plaintiff made up his allegations and that they did not believe he was racially harassed.

Rather than prosecuting those individuals who lied to protect a co-worker, defendant chose to make a scapegoat out of one worker, Mr. Hogan.  When he resigned, defendant happily announced that the matter

20

was concluded.  In fact, the racial discrimination goes on since all of the co-workers who supported Hogan are still working at Lancaster and, most importantly, so are the supervisors Bernie Reading and Bruce Rhodes.

Defendant has attached the final, written version of the internal report concerning Mr. Washington's complaint of racial harassment as Exhibit "A-5" to its Motion.  The summary of the interview with Mr. Hogan indicates that he denied all of the substantive allegations made by Mr. Washington.  Interviews are conducted with several co-workers on the gang, all of whom support Hogan (most of the workers are only mentioned in footnotes 2, 3 and 4).  In spite of the fact that the investigators found that Hogan, Rhodes and all of the Caucasian co-employees that they interviewed were lying, no charges were brought against anyone else, no follow-up investigation was conducted, no follow-up training and no follow-up report done to determine how this blatant racial harassment could be prevented in the future.  It is this obvious lack of an effective anti-racial harassment policy that has lead each and every one Mr. Washington's co-workers to believe that no racial harassment occurred and that it was Mr. Washington who was the real villain because he made up his accusations to get money or for some other reason.

Defendant's EEO Manager, Andrew McCollum, in charge of investigating Equal Employment Opportunity Complaints brought against the defendant, was deposed on November 7, 2003.  His deposition had

been scheduled weeks before, but did not go forward on the date it was scheduled.

Mr. McCollum testified that when an employee brings a complaint it is investigated by the Diversity Unit and a decision is made as to whether charges should be brought against anyone.  It is only when a person files a complaint with an outside agency such as the EEOC that Mr. McCollum's Unit becomes involved.  Therefore, he became involved in this matter only after plaintiff filed his complaint with the EEOC.

Amazingly, while Mr. McCollum testified that he conducted an investigation, visited the Lancaster Division, spoke with the Lancaster supervisor, Bernie Reading, and Bruce Rhodes, Washington's immediate supervisor, and other individuals who were members of the same gang as the plaintiff, he never took any notes concerning any of those conversations or regarding anything he did to investigate this matter.

The only written record is the letter that he sent to the EEOC in response to the plaintiff's complaint (attached as "EEOC letter from McCollum").  Therefore, Mr. McCollum's entire deposition was riddled with pauses during which Mr. McCollum attempted to remember events without any notes or documents other than his September 10, 2001 letter to the EEOC.  In that letter, he does not mention any independent interviews that he conducted but, rather, only states the obvious, that is, that a complaint was made by Mr. Washington, investigated by the company's Dispute Resolution's Office which brought charges against Mr. Hogan who

22

resigned before those charges could be heard against him.  Mr. McCollum

fails to inform the EEOC investigator that he conducted his own

investigation by going up to the Lancaster Office to interview Mr. Reading

and other members of the Lancaster Division gang in which plaintiff

worked.

Concerning his conversation with Mr. Reading, at first he did not

recall much of it other than the fact that Reading verified that he followed

the procedures by notifying the proper person once Washington came to

him with his complaint.  Later on in the deposition, he remembered other

parts of his conversation with Reading that included Reading telling him

that he did not believe that there were any racial problems at the Lancaster

Division, and that Reading had nothing to do with whether Washington

received a particular job since it was all based on seniority.

Concerning the effectiveness of the defendant's anti-racial

discrimination policy, Mr. McCollum's investigation did nothing to further

that policy.  He admitted that it was a violation of Amtrak's rules for a

supervisor to see or hear racial harassment and to do nothing about it, but

claimed that a worker had no obligation to report such treatment.  A worker

did have an obligation to tell the truth in an investigation.

While McCollum admitted that defendant's policy required

Supervisors to report racial harassment, and that it was a violation of

defendant's polices to lie to an investigator, McCollum stated that he never

brought charges against any supervisor in any investigation for failing to

report a violation of the defendant's anti-racial or sexual harassment policy. He <u>never</u> found that any co-worker in any investigation had lied to him. He believes that everyone has always told him the truth.

It is obvious that he did nothing to truly investigate Washington's claims since it is clear that if Mr. Washington was telling the truth, then not only was Hogan lying, but all of the other members of his gang were lying, including Bernie Reading and Bruce Rhodes. In spite of this obvious fact, McCollum never even challenged any of the people with whom he spoke about the discrepancy between Washington's version of what occurred and their version.

Furthermore, while he readily admitted that he was given a list of all of those individuals who were working in Washington's gang when these events occurred, he made only a cursory attempt to speak with them. He does not believe that he ever did. This issue is complicated by the fact that he remembers none of the names of those individuals with whom he spoke, and has no notes or records.

The Court should take judicial notice that in an investigation that is conducted in which no names are written down of the persons who are interviewed, no contemporaneous notes are taken of the statements of individuals and no record of what was done in the investigation is kept, that the investigation was not an effective one and cannot be said to have further the defendant's alleged policy of zero toleration for racial harassment.

McCollum was asked whether he ever attempted to speak with other minority employees at the Lancaster Division.  He claims that he did attempt to do so, but could not recall the name of the person or whether he ever actually spoke with that person.  Concerning these issues, as with many other important issues, his answers are riddled with hesitations and imprecise answers because he kept no record of what he did.

He does recall that he <u>never</u> asked anyone whom he interviewed at the Lancaster Division whether they had any prejudice against minorities, or whether they thought that Washington's complaints were valid.  He <u>never</u> compared anyone's original statement taken by the Diversity Unit shortly after Mr. Washington's complains were made, and the statements given to him.  He <u>never</u> spoke with Mr. Hogan.

He did speak with the investigator for the EEOC on several occasions, but could remember nothing of those conversations except for the fact that he recalls that the investigator wanted certain information and he tried to obtain it.  When counsel for the defendant asked him if he had read the plaintiff's EEOC complaint and whether he agreed that the EEOC complaint fails to set forth the specific job for which Washington complains that he did not receive because of his race, Mr. McCollum claimed that the plaintiff's failure to identify a specific job may have hindered his investigation.  When counsel for the plaintiff asked him why he did not simply ask for a clarification from the EEOC investigator with whom he had several conversations, he said that he just goes by the

complaint, itself, and asks no additional questions concerning it.  In other words, he has no duty to discover the truth.

It is obvious that Mr. McCollum had no desire to effectively investigate Mr. Washington's complaints or anyone else's complaints regarding racial harassment.

Mr. McCollum testified that his Unit also does training, and that on an annual basis training sessions are held with managers, foremen and any other persons who wish to attend concerning the law regarding sexual or racial harassment in the workplace.  When asked whether the defendant used any particular method to determine whether the training that they gave was effective, he answered that the only way was to investigate individual complaints.  He said that he did not know any other method of determining whether training given to people regarding sexual or racial harassment was effective.  Obviously, he has never heard of a "pro active" system whereby investigators go out and actually talk to workers to determine what their attitudes are and what actually happens in the workplace.  Once again, the contrast with the defendant's safety policies highlights how seriously the defendants take safety training and how casually they take racial and sexual harassment training.

When Mr. McCollum was asked whether he ever wrote to the EEOC concerning a complaint of racial or sexual harassment and stated that the defendant agreed with the claims made by the complainant, he answered that he did that in this case.  He stated that this was the only case in which

he did that.  As the defendant's EEOC manager, Mr. McCollum has testified that he agreed with the plaintiff's complaint filed with the EEOC and informed the EEOC of that fact.  He stated this even though it is obvious that the defendant contested plaintiff's claim in the EEOC and continues to contest plaintiff's claims.  The misunderstanding in brought on by the fact that Mr. McCollum believes that going through the motions of enforcing a racial harassment policy is the same thing as effectively enforcing that policy.  For example, he testified that in interviewing Bernie Reading concerning this matter, his major concern was to determine whether Reading followed the proper procedure and since Reading did so, he believes that Reading did nothing wrong.  In coming to this conclusion, McCollum was forced to ignore the defendant's own policies and procedures which require that managers and foremen to actively enforce the defendant's sexual/racial harassment policy and not just sit back and wait for somebody to make a complaint.

In summary, the facts of this case show that the defendant did nothing to eliminate the pervasive racial harassment that takes place at the Lancaster Division.  In fact, its practices have increased the racial tension at Lancaster because all of the Caucasian workers believe that plaintiff lied and manipulated the system to get money or preferential treatment.  If anything, those co-workers who were prejudiced against African-Americans now think that they are justified in their prejudice.

II.    **Defendant's Alleged Undisputed Facts**

      **A.  Defendant Fails to Enforce Its Racial Harassment and Discrimination Policy.**

Defendant claims that it is undisputed that it maintains and enforces a strong and effective policy prohibiting racial harassment and discrimination.  This is totally untrue and is greatly disputed in this case.

The evidence is overwhelming that while the defendant did give  lip-service to a policy of anti-racial discrimination and harassment, it did nothing to enforce that policy or to train its employees concerning it.

As defendant admits, it requires its employees to report harassing conduct so that it can take necessary steps to rid its workplace of such behavior.  There is direct evidence from Bruce Rhodes that whenever he hears racial jokes, he turns away.  He refused to 'get involved" in this matter.  He never has reprimanded any of his workers for making racial comments; in fact, he claims that he has never heard a racial comment, as incredible as that is.  He does nothing to enforce the defendant's anti-discrimination policies.

At the next level of supervision, Bernie Reading, has testified that he does nothing to enforce this policy.  At the level above that, James

Herndon, has testified he is barely aware of the policy and does nothing to enforce it.

Finally, the internal investigation conducted in this case is more than sufficient evidence that defendant's own in-house investigation team does nothing to enforce its policies.  While it believes that several co-workers lied in order to support Mr. Hogan's attempts to cover up their racial harassment, they did nothing to bring claims against those individuals.

In support of its claim that it has an "undisputed effective policy", defendant does nothing but list a series of letters and booklets, and some perfunctory training sessions.  There are no statistics on how many complaints are made regarding racial harassment and the outcome of those complaints, no statistics on the effectiveness of its "diversity policy" or how many non-whites are in managerial/foreman positions.

The evidence set forth in the depositions taken in this case prove that discrimination cannot be ended by merely writing policies without effectively enforcing them.  They have done nothing to bring these policies into the workplace.  They have not even hung posters reminding employees on a daily basis of the anti-racial harassment and discrimination policy (Reading, 47), even though such posters are required to be displayed by law (McCollum).

Actions speak louder than words, and defendants actions have indicated to its employees that it does not take seriously its anti-racial discrimination and harassment policy.  Even its actions regarding Mr.

Hogan did nothing to advance its policy.  The brief investigation conducted concerning Mr. Washington's complaint made clear that Mr. Washington had a valid complaint and that he was subject to racial discrimination and harassment in the Lancaster Division.  Instead of bringing actions against all of those who cooperated and witnessed Hogan's incredible behavior then conspired in a cover-up, they decided to bring an action against Mr. Hogan, only.  Instead of going forward with the action, they allowed Mr. Hogan to resign and to place into evidence a self-serving letter in which he denies all of the allegations made against him.

### B.      Plaintiff's Application for the  Boom Truck Position

Defendant claims that there is no dispute concerning its hiring and advancement procedures.  Defendant claims that, essentially, all of this is controlled by a union contract and that it has absolutely no control over who gets what job.

Once again, the policy and the practice diverge.

In his deposition, Mr. Washington states that in September, 2000, he advised Bernie Reading that he wanted to apply for the boom truck operator position (Washington, 72).  He testified that in September, 2000, he noticed that there was a truck driver position on the "board", that is, posted as being available.  It was an in-house position meaning that everyone in Lancaster would have the ability to apply for this job before anyone outside of Lancaster could apply for it.  Washington stated that he

went to Reading and asked him if he could have the job and Reading asked him if he was "qualified" to operate the truck. Becoming "qualified" required that someone in authority review an applicant's actual performance of handling a boom truck and confirm that the applicant could do the job. Washington replied that he was not, but that he was obviously capable of operating a boom truck since he had already done so, many times, at Lancaster. Reading told him to write down the positions he wanted and to give it to him in writing which Washington did (Washington, 72-73).

Reading stated that someone would have to come out to train him on operating the boom truck, but Washington replied that he already knew how to operate the vehicles and that all he needed to be was "qualified" by having someone verify that he could operate the machines. Reading replied that it would take a while to get someone to Lancaster to qualify him.

In the meantime, without informing Mr. Washington, Reading had another individual, Al Lewis, a Caucasian, being trained for the position and doing what was necessary for him to receive a commercial driver's license (CDL), something that Mr. Washington already had. After Lewis was trained and received his CDL license, Reading qualified him and gave him the job.

Mr. Washington's claim is simply that they avoided the usual procedures by informing him that they were waiting for someone to qualify

31

him on a job when, in the meantime, they were actually training and qualifying another individual for the same position, then gave that position to this other person, Al Lewis.  As Herndon confirmed, the job should have been given to Washington since he was the most senior person with a CDL.

Given the nature of the position, Mr. Washington has testified that Mr. Lewis now has a "untouchable" position that cannot be bumped by anyone, realistically.  See pages 72 through 74 of Washington's deposition.

Defendant has presented no evidence to contradict this testimony that the defendants have violated the union policies, the <u>Thorton</u> Decree and its own contract by avoiding the normal and necessary procedures for obtaining a position in order to ensure that Mr. Washington was not given a position of importance as a boom truck operator.

Washington goes on to explain that he was lulled into a false sense of security when Reading told him that there was no one there to qualify anyone for the job and, so, when Al Lewis told Washington that he had applied for the job also, Washington felt secure because Reading had told him that there was no one there to qualify anyone for the job and it would take a while to get someone to do that (Washington, 76-77).

Regarding the normal procedures for obtaining such a job, Washington explained that it was "in-house" and that you did not bid for this job in the normal way that other jobs were bid for.  First, you had to become qualified and only then could you bid for the job.  Since neither Al

Lewis nor he was qualified, both of them would have to get qualified before they could bid on the job (Washington, 78-79).

Washington's sworn testimony is that he properly asked Reading for the job, and Reading promised to qualify him as soon as someone was available. Instead, they had Al Lewis, who did not even have a CDL license, get his license, then qualified him for the job so that it would not be given to Washington.

Given the testimony concerning the racial harassment endured by Mr. Washington while at the Lancaster Division, there is clear evidence that this maneuvering was all done to prevent Mr. Washington from obtaining the position of boom truck operator because of his race.

Mr. Washington goes on to testify that in any Division other than the Lancaster Division, because he had already been operating the equipment on a temporary basis, the supervisor would have marked him down as being qualified without having to go through any formal test (Washington, 80). In Lancaster, there exists a different set of rules, for African-Americans, that is.

The only undisputed fact concerning this claim is that Al Lewis did receive the job of boom truck operator and plaintiff did not. Mr. Reading has denied having any conversation with plaintiff regarding this job. There is an obvious dispute concerning the facts and, therefore, this claim should not be subject to summary judgment.

### III.    Plaintiff's Legal Claims

Plaintiff has asserted claims under Section 1981, Title VII and the Pennsylvania Human Relations Act.

### IV.    Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants, to be successful, must prove that, in considering the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, . . . there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c). An issue is "material" if the dispute may affect the outcome of the suit under the governing law and is "genuine" if a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The Court must draw all reasonable inferences in favor of the party against whom judgment is sought. See American Flint Glass Workers, AFL-CIO v. Beaumont Glass Company, 62 F.3d 574, 578 (3d Cir. 1995). The substantive law controlling the case will determine those facts that are material for the purpose of summary judgment. See Anderson, 477 U.S. at 248.

**V.     The Existence of Respondeat Superior**

Defendant states that its Motion for Summary Judgment is based solely on its claim that plaintiff has failed to meet the requirement of respondeat superior, and, therefore, plaintiff will address only this issue in his answer.

Plaintiff has met his burden in proving that the defendant failed to take appropriate remedial action in this matter.  Additionally, there is direct evidence that a supervisor was involved in the racial harassment since Mr. Rhodes has testified that he was aware of the racial incidents concerning Mr. Washington and did nothing about them.  Under the defendant's own policies and regulations, the term "harassment" must be interpreted "broadly" (see Exhibit "A-1" attached to defendant's Motion for Summary Judgment).  On page 4 of this same document is a section entitled "Responsibility" and it states:

> Every Amtrak employee has responsibility for maintaining a discrimination and harassment – free workplace.  Amtrak encourages employees to report violations of this policy. Managers and supervisors should become aware of any violation of this policy are required to report promptly to the Dispute Resolution Office.  The Vice President and Council for Business Diversity and the General Council are responsible for the interpretation, application at administration of this policy.

Therefore, Rhodes was compelled to report the racial harassment of Washington and failed to do so.  While the written report concerning the in-house investigation interview of Rhodes only speaks about the noose

incident, in Rhodes own statement, a copy of which is attached at the end of his deposition, he states that he was also aware of the fact that Hogan taped Mr. Washington to the bus.  He goes on to say, in the same statement, that he did not believe that the noose was placed near Mr. Washington as a threat to anyone.  In his deposition, he contradicts almost each of these statements and admits that he asked the men to  take down the noose because he believed that someone (Washington) could get the idea that the workers meant to harm him.

Concerning racial comments, when directly asked if he had ever heard them, Rhodes gave a halting reply admitting that he was "sure somebody may have said one that I haven't heard or it was said and it didn't sink in what was said maybe".

When asked about racial jokes, Rhodes testified that he was "sure they're told, and if they are told "I try not to pay attention to them" (Rhodes, 46).  All of this is in direct violation of the stated policy of the defendant that managers and supervisors such as Rhodes who become aware of any violation of this policy are <u>required</u> to report it.

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate or successively higher authority over the employee.  See <u>Faragher v. City of Boca Raton</u>, 118 S.Ct. 2275 (1998); <u>Suder v. Easton</u>, 325 F.3d 432 (3d Cir. 2003).  Furthermore, the employers also have an affirmative duty to prevent harassment by supervisors.  See <u>Faragher,</u> 524

U.S. et 793, 118 S.Ct. et 2293; <u>Weston v. Commonwealth</u>, 251 F.3d 420 (3d Cir. 2001).

Regarding co-workers, an employer is negligent if it knew or should have known of racial harassment and failed to stop it or to take any effective actions to prevent it.  See <u>Burlington Industry, Inc. v. Ellerth</u>, 524 U.S. 742, 759 (1998).

Defendant relies upon the holding in <u>Weston,</u> but fails to correctly summarize that case.  In fact, the holding in <u>Weston</u> has no applicability to this matter since it involved a dismissal of a complaint under Rule 12(b)(6) and not under Rule 56.  The Court held that the plaintiff failed to plead a proper case of sexual harassment and, therefore, there was no discussion of the actual facts of the case.

The more instructive case is the holding in <u>Suders v. Easton</u>, 325 F.3d 432 (3d Cir. 2003) in which the Court examined the state of law of employer liability in racial and sexual harassment cases where the harassment was done by a co-worker or supervisor.  The Court summarized the current law in its first paragraph:

> In <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), the Supreme Court addressed the scope of the vicarious liability of an employer for the discriminatory and harassing conduct of its supervisors in the context of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Â§ 2000e, et seq. ("Title VII"). The Court also sought to clarify the confusion among the Courts of Appeals as to the scope and proper grounds for such liability. To that end, the Court held that an employer shall be strictly liable to a victimized employee for an actionable hostile work environment created by a supervisor, when the

discrimination or harassment at issue results in a "tangible employment action." <u>Ellerth</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 807. Furthermore, the Court defined a tangible employment action in general, categorical terms: "a significant change in employment status," often, but not always, resulting in economic injury. <u>Ellerth</u>, 524 U.S. at 761-62; see also <u>Faragher</u>, 524 U.S. at 808. A tangible employment action was also defined by reference to a non-exclusive list of possible actions: "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Ellerth</u>, 524 U.S. at 761; see also <u>Faragher</u>, 524 U.S. at 790. When no tangible employment action results, the employer may still be liable, but it may raise an affirmative defense to liability or damages. The affirmative defense has two components: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Ellerth</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 807.

The Court reversed the District Court's summary judgment in favor of the defendants. After a lengthy analysis, the Court concluded that summary judgment is not appropriate where a plaintiff proves that as a result of sexual or racial harassment he was forced to leave his position and, in effect, was constructively discharged.

In the present case, in his complaint, plaintiff has alleged that he was constructively discharged and defendant does not dispute that claim, nor seek to move for summary judgment on it. Defendant has raised no affirmative defenses in its Motion, and, therefore, the issue of whether an adverse employment action was taken against Washington is not even relevant.

Whether the Court concludes that the racial harassment was coming from a co-worker or a supervisor, plaintiff has presented more than sufficient facts to allow this matter to proceed to trial. The actions taken by the defendant cumulating in the resignation of Mr. Hogan did nothing to alleviate the racial prejudice that exists at the Lancaster Division, and the racial harassment that must be suffered by all African American's who are stationed there. Furthermore, there is direct evidence that Mr. Washington's supervisor, Mr. Rhodes, purposefully avoided confronting workers who made racial comments or jokes. This evidence is so overwhelming that it could very well form the basis of a directed verdict on this issue.

## VI.    Boom Truck Operator Position

Defendant seeks to avoid liability for preventing the plaintiff from becoming a boom truck operator based on a narrow reading of one statement made by the plaintiff in the course of his deposition, that is, that he did not bid on the boom truck operator job.

In fact, as stated-above, Mr. Washington made abundantly clear that the boom truck operator job was posted "in house" in Lancaster (a fact that the defendant has not denied even though it has presented an affidavit from Bernie Reading, as to this issue). Mr. Washington testified that he

could not bid for the job until he became "qualified" for it and set forth, in detail, how Mr. Reading sought to obtain the position for a Caucasian employee, Al Lewis.  Therefore, it is obvious that Mr. Washington is stating that if he had been allowed to qualify for the job as Al Lewis had, he would of be given it since he had more seniority then Mr. Lewis for this position. He was prevented from qualifying for the job by Mr. Reading and, therefore, prevented from bidding on it.

Defendant's argument that the plaintiff did not bid on the job and, therefore, could not complain about not receiving it is a cynical attempt to avoid its liability on this issue.

Then, defendant argues that Mr. Washington's failure to get the boom truck operator job was without consequence because Mr. Lewis was "bumped" out of the job on December 19, 2000 or 2003 (the affidavit presented by Mr. Reading indicates only that Mr. Lewis was bumped before December 19, 2003).  There is no evidence to suggest that Mr. Washington would have been bumped out of his position as Al Lewis apparently was and, more importantly, defendant cites no law, whatsoever, for the proposition that a defendant who has illegally prevented one of its own employees from obtaining a job because of that employee's race will be granted immunity from liability if it can prove that the job in question would not have lasted that long, anyway.

The defendant remains liable because it prevented the plaintiff from obtaining the boom truck operator position because of his race.

40

Essentially, in the Lancaster Division, they decided to ignore the <u>Thorton</u> Consent Decree which mandated that management could not pick and choose what workers it wished to promote.  In the present case, that is exactly what Mr. Reading did.

Contrary to the defendant's argument that the plaintiff has produced no evidence to prove his claim regarding the boom truck operator position, plaintiff has presented a detailed account of his conversation with Bernie Reading and of how Mr. Reading manipulated the system so as to ensure that Mr. Washington did not receive the boom truck operator position. Reading did this by "stringing along" Washington by claiming that he was still looking for someone who could take the time to "qualify" Washington as a boom truck operator when, in fact, behind the scenes, he was already preparing Al Lewis for that position by having him go through the training necessary to obtain a CDL license and, then, having Mr. Lewis qualified, thus enabling Lewis to bid for the job while Washington remained waiting for Mr. Reading to provide someone to "qualify him".

Perhaps, the most important fact is that in the affidavit supplied by Bernie Reading he does not deny Mr. Washington's story, nor does he deny any of the details of that story, such as the fact that you need to be qualified before you can bid on a job or that Mr. Lewis did not even have his CDL license when he began training for the job.

41

## VII.    Assistant Engineer Position

Plaintiff has established a prima facie case of race discrimination concerning his applications for the position of Assistant Engineer.  It is undisputed that (1) plaintiff is a member of a protected class; (2) he is qualified for the position sought (the only requirement is a high school education); (3) he suffered an adverse employment action, that is, he did not get the position sought; and (4) the surrounding circumstances give rise to an inference of discrimination.

The only arguable dispute regarding the above-stated factors is whether the surrounding circumstances give rise to an inference of discrimination.

A plaintiff can withstand a motion for summary judgment if the plaintiff produces direct evidence of discriminatory intent or indirect evidence from which a fact-finder can infer that the employer's justifications were pretextual and that racial discrimination more likely than not motivated the employer's actions.  Pollock v. AT&T, 794 F.2d 860 (3d Cir. 1986).

In Pollock, the Court reviewed the entire history of the matter before determining that the plaintiff, claiming that she was fired because of racial discrimination, presented facts that gave rise to an inference of discrimination.  The facts that are presented in Pollock are very similar to the facts set forth in this case because, in both instances, plaintiff is relying on the actual discrimination that has occurred and the defendant's

42

failure to take any effective action to eliminate such discrimination, as proof of a discriminatory intent.

Furthermore, plaintiff has pursued this claim and sought discovery from the defendant. Defendant has failed to provide a breakdown regarding the racial makeup of its engineer positions. Defendant has refused to supply those reports that are mandated by the <u>Thorton</u> Consent Decree which would indicate the number of minorities in various positions, the number of minorities who applied for those positions and the number of minorities actually interviewed for those positions. Pursuant to the <u>Thorton</u> Consent Decree, defendant is required to interview a certain minimal percentage of minorities for each position based on the number of minority applicants in the job pool. Defendant has presented no evidence regarding this and has refused to provide it.

Defendant has provided information regarding certain specific positions for which plaintiff applied. For example, attached are records dealing with an engineer position applied for by plaintiff and actually given to a "Barry V. Kaltenstein." Attached are records advising Mr. Kaltenstein that he has been given the position, and those to Mr. Washington indicating that while he met the requirements, he was not given the position. The letter sent to Mr. Washington is a "form" letter that does not state what "background and experience" that the successful candidate had and that Mr. Washington lacks. No mention is made of a lack of seniority - the reason that defendant claims that plaintiff never received any job that

43

he applied for.  Additionally, we have attached a copy of Mr. Washington's application along with a copy of Mr. Kaltenstein's application and the interview notes with Mr. Kaltenstein.  Based on a review of the application and records, there is no distinct difference between Mr. Washington's background and employment history and Mr. Kaltenstein's.  In fact, Mr. Washington states that he has an air break and mechanical background and that he is "NORC Qualified" while Mr. Kaltenstein does not indicate any such experience or that he has the proper NORAC qualifications.

The application, itself, is suspect in that the defendant asks for information concerning "relatives at Amtrak".

Mr. Washington was never even interviewed for this position, and there is no indication that Mr. Kaltenstein has any better qualifications than he has for this job.  The record does not indicate that the defendant has proven or presented any evidence that it had a legitimate non-discriminatory reason for its decision not to hire Mr. Washington for this engineer position.

Looking at the handwritten interview notes of Mr. Kaltenstein, there are no questions asked of him concerning his attitude toward minorities and woman, although there are several questions asked about his safety background and the fact that he always makes sure that safety comes first.  Once again, this is clear proof that the defendant has no interest in promoting its anti-racial and sexual harassment policies since it does nothing to properly screen candidates who may have racial prejudices.

Certainly, at the very least, asking potential candidate if they would have any problem adhering to or enforcing the defendant's anti-racial discrimination policies would send a message to all workers that the defendant takes those regulations seriously. There is no doubt that it has communicated to its workers that it takes it safety regulations seriously.

Regarding other locomotive engineer or assistant engineer positions that Washington applied for, defendant has supplied some "applicant flow logs". Attached is one applicant flow log for a locomotive engineer position that apparently was done sometime in January, 2001 (Bates Numbers D00563 and D00564). The applicant flow log indicates only those applicants who were interviewed. There is no other data kept on the actual applications indicating a persons race or national arrogant or gender. Even this form, as inadequate as it is, is not filled out in that there are no "EEO race codes" indicated for any of the applicants who were actually interviewed for this job.

Again, plaintiff met all of the qualifications necessary for this job. He did not receive the job, and defendant has failed to articulate any rational reason why he did not receive it. Based on the evidence found in this case concerning the defendant's failure to abide by its own anti-racial discrimination policy, there is an inference that the reason that he was not given the job was because of his race.

VIII.    Past Civil Rights Claims Against Lancaster Division

Throughout this litigation, plaintiff has requested other claims involving the Lancaster Division in which an individual claimed discrimination of some type.  Throughout this litigation, defendant has claimed that there were no other discrimination claims in the Lancaster Division.

Andrew McCollum, EEO Manger for the defendant, was specifically asked whether he was aware of any other claims involving the Lancaster Division.  He replied that he was not aware of any other claims involving the Lancaster Division.  He stated that there were records kept based on employment discrimination complaints by Division, and that he checked those records, and there were none for the Lancaster Division.

The records of the United States District Court for the Eastern District of Pennsylvania indicate that a lawsuit was started at number 01-1178 by Seamus J. Martin who was employed as a brick mason in the Lancaster Division on January 12, 1998.  Mr. Martin complained that from that date until March 13, 2000, Amtrak permitted its employees to engage in a course of national origin discrimination against him.  In his complaint, he states that he complained to his general supervisor (Bernie Reading had that job at the time) and to his foreman, but neither took any action to stop the harassment and, therefore, he started his lawsuit.

This is direct evidence that the defendant has failed to properly answer plaintiff's request for information concerning previous employment

discrimination complaints made at the Lancaster Division.  Mr. Reading, himself, claimed that there were no such accusations made in his Division.

Of course, it is possible that this is an oversight and that defendant did not deliberately attempt to hide this information from plaintiff.  In that case, it is one more indication of how casually the defendant takes its obligations to enforce its anti-employment discrimination policies.

IX.    Conclusion

Plaintiff has presented more than sufficient evidence to meet the summary judgment standard by proving that a supervisor, Bruce Rhodes, directly discriminated against the plaintiff by being aware of the harassment by the members of the Lancaster gang against Mr. Washington because of his race and failing to report that harassment, a direct violation of the defendant's own policies.  Additionally, there is evidence, admitted by the defendant, that a co-worker, Mr. Hogan, directly harassed the plaintiff.  Finally, there is abundant evidence that the defendant does not have an effective anti-discrimination policy since it does nothing to enforce the written policy that it has.

The "Diversity Group" that is charged with investigations of racial discrimination failed to pursue co-workers who lied to them and managers who failed to enforce its policies.  If it had bothered to ask, it would have discovered that the manager in charge of the gang that was harassing the

plaintiff may have heard racial comments and jokes but believes that he has no obligation to do anything about it.

Regarding the boom truck operator position, Mr. Washington has stated a clear case of discrimination in describing what took place regarding that position. Defendants have failed to present any evidence in contradiction to Washington's sworn testimony.

Regarding the engineer positions, Washington has presented clear evidence that he was qualified for the job, and that he was not given the job because of his race, an inference that can easily be established based on the defendant's failure to take its anti-discrimination policy seriously. Defendant has failed to state any justifiable reason why plaintiff did not receive this job. Its constant "mantra" that everything is decided by seniority is not true based on its own records which indicate that Mr. Washington was told that he did not receive an engineering position because there were other better qualified people. In fact, the person who received one of these jobs instead of Washington has no better qualification or background than Washington and, in fact, lacks the training and certifications that Washington possessed.

Finally, while there may be a dispute as to the weight of the evidence presented on either side of any of these issues, there can be no dispute that all of the facts in this case are in dispute and, therefore, summary judgment is not appropriate.

Respectfully submitted by,


**ARMANDO A. PANDOLA, JR., ESQUIRE**
**Attorney for Plaintiff**

## PLAINTIFF'S EXHIBIT LIST

1. **Washington Deposition pages 18-19, 22, 26 – 50 , 72 – 80.**

2. **Rhodes Deposition          pages 21 – 28, 33 – 42, 55 and Rhodes written statement.**

3. **Reading deposition pages 13 – 19, 22 – 26, 41 – 48, 51 – 56, 60 – 61 and Reading signed statement.**

4. **Herndon deposition pages 12 – 14, 17 – 19, 33, 36 – 39, 42 – 43.**

5. **Engineer position records.**

6. **EEOC Letter from McCollum**

## <u>V E R I F I C A T I O N</u>

ARMANDO A. PANDOLA, JR., ESQUIRE, states that he is the attorney for Plaintiff herein, and that the facts set forth in the foregoing pleading are true and correct to the best of his knowledge, information and belief, and that this statement is made subject to the penalties of relating to unsworn falsification to authorities.

Date:_____          _____
                                       ARMANDO A.PANDOLA, JR.

**ARMANDO A. PANDOLA, JR.**
**Identification No.: 27608**
**400 Sterling Commerce Center**          **ATTORNEY FOR PLAINTIFF**
**1819 JFK Boulevard**
**Philadelphia, Pa  19103**
**(215) 568-5010**

| | |
|---|---|
| **JEROLD WASHINGTON** | **UNITED STATES DISTRICT COURT** |
| | **FOR THE EASTERN DISTRICT OF** |
| **Vs.** | **PENNSYLVANIA** |
| | |
| **NATIONAL RAILROAD PASSENGER** | **CIVIL ACTION NO. 02-CV-4451** |
| **CORPORATION D/B/A AMTRAK** | |

<u>**CERTIFICATION OF SERVICE**</u>

   **Armando A. Pandola, Jr., Esquire, attorney for plaintiff hereby certifies that the attorney of record in the attached action has been served with a true and correct copy of Plaintiff's Answer to Defendant's Motion for Summary Judgment by first class mail on                              , 2003 to the following:**

     **Paul Evans, Esquire**
     **Morgan Lewis & Bockius, LLP**
     **1701 Market Street**
     **Philadelphia, PA 19103-2921**

     _____
     **ARMANDO A. PANDOLA, JR.**